[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1188 
The appellant, Bobby Wayne Waldrop, currently an inmate on death row at Holman Correctional Facility, appeals the circuit court's denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P.
In 1999, Waldrop was convicted of murdering his maternal grandparents, Sherrell and Irene Prestridge.[1] The jury, by a vote of 10 to 2, recommended that Waldrop be sentenced to life imprisonment without the possibility of parole. The circuit court overrode the jury's recommendation and sentenced Waldrop to death. Waldrop's conviction and death sentence were affirmed on direct appeal. See Waldrop v. State,859 So.2d 1138 (Ala.Crim.App. 2000), aff'd, 859 So.2d 1181
(Ala. 2002), cert. denied, 540 U.S. 968, 124 S.Ct. 430,157 L.Ed.2d 314 (2003). This Court issued the certificate of judgment on April 29, 2003.
On April 23, 2004, Waldrop filed a Rule 32 petition in the Randolph County Circuit Court. The circuit court summarily dismissed several claims and held a hearing on the numerous remaining claims concerning the ineffective assistance of trial counsel. After a hearing the circuit court denied the postconviction petition. This appeal followed.
The State's evidence at Waldrop's trial showed the following:
 "Testimony presented at trial indicated that Waldrop and his wife Clara Waldrop resided with Waldrop's grandparents, Sherrell and Irene Prestridge. Sherrell had heart and hip problems and had difficulty walking. Irene was bedridden and blind and suffered from diabetes. Because of Sherrell's and Irene's infirmities, the living room of their house had been converted into a bedroom with two hospital beds where they slept. Testimony indicated that Waldrop knew that Sherrell and Irene received their Social Security checks on the first and the third of each month.
 "At some time between 10:30 a.m. and 2:00 p.m. on April 5, 1998, Waldrop and Clara left the Prestridge's house and checked into a hotel in Anniston. At 1:00 p.m. that same day, Clara and Waldrop pawned Sherrell's lawn mower. That afternoon Waldrop smoked an undetermined amount of crack cocaine.
 "During the evening of April 5, Clara and Waldrop returned to the Prestridge's house. Testimony indicated that Waldrop was not high when he *Page 1189 
returned to the house. While in his grandparents' bedroom, Waldrop and Sherrell began arguing about money. Waldrop stabbed Sherrell with a knife, and a scuffle ensued. Waldrop cut Sherrell's throat and attempted to choke him. Because Sherrell appeared to be breathing, Waldrop continued to stab Sherrell several times. In a statement Waldrop made to the police, which was introduced at trial, Waldrop stated that `[i]t looked like [Sherrell] was suffering.' (C. 182-84.) After Waldrop stabbed Sherrell in the back, he appeared to stop breathing. Testimony indicated that Irene was screaming loudly throughout the incident.
 "After killing Sherrell, Waldrop went outside and removed gloves from the trunk of his car. Waldrop returned to the house and instructed Clara to kill Irene. Both Waldrop and Clara then put on gloves.
 "Clara cut and stabbed Irene approximately two times. Waldrop grabbed the knife Clara had in her hand, put a pillow over Irene's face, and stabbed Irene in the chest and the throat. During a videotaped statement, Waldrop stated that, before he stabbed Irene, she told him that she loved him. Additionally, a statement Christy Waldrop, Waldrop's sister, made to the police revealed that Waldrop had told her that, during the incident, Irene told Sherrell that she loved him and that she would see him in heaven. (R. 862-63.)
 "After the killings, Waldrop went into the bathroom and cleaned off the blood. Waldrop instructed Clara to take Sherrell's wallet. Clara took the wallet out of Sherrell's back pocket and put it in her purse. Waldrop put the clothing he was wearing during the killing and the knives in a plastic bag, and he and Clara left the house. Waldrop threw the bag into the river.
 "Gregory Wanger, a forensic pathologist, testified that he performed autopsies on the bodies of Sherrell and Irene Prestridge. Wanger stated that Sherrell sustained 43 stab and cut wounds to the head, neck, back, and chest, and that Irene sustained 38 stab and cut wounds, including wounds to the heart and lungs.
 "Dr. Tackett, a professor of pharmacology and toxicology, testified concerning the addictive nature of crack cocaine. Dr. Tackett stated that, in his opinion, Waldrop was addicted to cocaine. According to Dr. Tackett, he believed that Waldrop was craving crack cocaine at the time of the killings, and that Waldrop killed his grandparents in an effort to obtain money to acquire more crack cocaine. Dr. Tackett stated that, in his opinion, using crack cocaine creates a strong craving for more crack cocaine, and the acquisition of more cocaine can become the dominant goal in an addicted person's life."
859 So.2d at 1144-45.[2]
 Standard of Review
In a postconviction proceeding, the petitioner bears the sole burden of pleading and proof. "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala.R.Crim.P.
The standard of review this Court uses when evaluating the rulings in a Rule 32 proceeding is whether the circuit court abused its discretion. See Elliott v. State,601 So.2d 1118, 1119 (Ala.Crim.App. 1992). "[W]hen the facts are undisputed and an *Page 1190 
appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Exparte White, 792 So.2d 1097, 1098 (Ala. 2001). "The plain-error standard of review does not apply when this Court evaluates the denial of a collateral petition attacking a death sentence." Hunt v. State, 940 So.2d 1041, 1049
(Ala.Crim.App. 2005).
 I.
Waldrop argues that the circuit court erred in excluding hearsay mitigating evidence at his Rule 32 evidentiary hearing. He argues that because hearsay evidence is admissible at a sentencing hearing in a capital-murder trial, it is also admissible at a postconviction proceeding attacking a death sentence.
However, Waldrop's argument is inconsistent with prior cases of this Court. As we stated in Hunt v. State:
"The Alabama Rules of Evidence apply to Rule 32 proceedings. Rule 804, Ala.R.Evid., specifically excludes hearsay evidence. We addressed this identical issue in Giles v. State,906 So.2d 963 (Ala.Crim.App. 2004), overruled on other grounds,Ex parte Jenkins, 972 So.2d 159 (Ala. 2005), and stated:
 "`Giles specifically argues that the circuit court erroneously failed to consider the hearsay testimony of two witnesses as to what Giles told them about a drug relationship between him and Carl Nelson. Giles argues that the circuit court misapplied the evidentiary rules governing capital sentencing because hearsay evidence is admissible at the sentencing portion of a capital-murder trial.
 "`However, what Giles fails to consider is whether the Rules of Evidence apply to Rule 32 proceedings. See Rule 101, Ala.R.Evid., and Rule 1101(a), Ala.R.Evid., which states, in part, "these rules of evidence apply in all proceedings in the Courts of Alabama. . . ." Rule 1101(b), Ala.R.Evid., lists the proceedings exempt from application of the Rules of Evidence. Those proceedings include proceedings concerning preliminary questions of fact, grand jury proceedings, extradition proceedings, preliminary hearings in criminal cases, sentencing or probation revocation hearings, proceedings related to the issuance of a warrant of arrest, criminal summonses, or search warrants, bail proceedings, and contempt proceedings.
 "`The Rules of Evidence apply to postconviction proceedings. See De-Bruce v. State, 890 So.2d 1068 (Ala.Crim.App. 2003). Rule 804, Ala. R.Evid., specifically excludes hearsay evidence. The circuit court correctly applied existing law and excluded the hearsay statements presented concerning an alleged drug relationship between Giles and one of the victims. After excluding the hearsay evidence, the circuit court was left with no lawful evidence to support this contention. Relief was correctly denied on this ground. See DeBruce, supra.'
906 So.2d at 985-86. The circuit court committed no error in excluding the affidavits and the hearsay testimony of co-counsel." 940 So.2d at 1051.
Moreover, even if the hearsay evidence was admissible at the evidentiary hearing, its exclusion in this case was harmless. The vast majority of excluded evidence appeared to be cumulative of testimony that had been presented at the hearing. "`[T]he exclusion of admissible evidence does not constitute reversible error where the evidence "would have been merely cumulative of other evidence of the same nature, which was admitted."' *Page 1191 Houston v. State, 565 So.2d 277, 281
(Ala.Cr.App. 1990)." Nettles v. State, 683 So.2d 9, 13
(Ala.Crim.App. 1996).
In Part IV of Waldrop's brief, [3] Waldrop further asserts that the court erred in not allowing witnesses to testify at the evidentiary hearing whose testimony met an exception to the hearsay rule. We have reviewed the pages of the record Waldrop cites. In the majority of instances the witness had already answered the question when an objection was made, and the State did not move to strike the answer. Thus, the challenged evidence was introduced and "whatever error, if any there was, in sustaining the State's objection to the question, the error was without injury to the defendant." Word v. State,424 So.2d 1374, 1377 (Ala.Crim.App. 1982). In the few instances where the answer was not made before the objection, Waldrop failed to make an offer of proof or argue how the excluded testimony met any exception to the hearsay rule.
Waldrop also argues that the court erroneously excluded evidence concerning the witnesses' mental states, i.e., how they felt about Waldrop. During direct examination of Rev. Freddie Whitley, the following occurred:
 "[Defense counsel]: How do you feel about Bobby?
 "[Rev. Whitley]: Well, I love Bobby.
 "[Assistant attorney general]: Object to that.
 "The Court: Sustained."[4]
(R. 180.) The question was answered, and the State made no motion to strike; thus, any error in sustaining the objection was error without injury. See Word.
 II.
Waldrop next argues that the circuit court erred in excluding the testimony of Dr. Martha Loring, a certified social worker, and Dr. Ralph Tarter, a clinical neuropsychologist, at the evidentiary hearing.
In his Rule 32 petition, Waldrop alleged that counsel was ineffective for failing to seek the assistance of an psychologist, a social worker, and a mitigation expert. (C.R. 31-34.) However, no experts were identified by name in the section of Waldrop's Rule 32 petition where this allegation is made.
In an order issued before the evidentiary hearing, the court denied this claim and stated:
 "Waldrop asserts that his counsel was ineffective for not seeking funds for various experts. One such expert Waldrop indicates should have been hired was `a psychologist specializing in coerced confessions [so that] the jury would have learned that intoxication prevented Mr. Waldrop from competently and voluntarily waiving his rights.' This particular assertion overlooks the facts that both the trial court and the expert called by the defense stated that from their observations of the video Waldrop was not under the influence of drugs. `Dueling experts,' both called by the defense, would not have changed the outcome of the proceeding. Further, the Court of Criminal Appeals reviewed the videotaped statement and stated, `[w]e conclude that there is no indication that Waldrop was so intoxicated that he could not comprehend his circumstances or that his statements were rendered *Page 1192 
involuntary.' Waldrop, 859 So.2d at 1158.
"Waldrop also asserts that counsel should have hired a psychologist that would have testified about his `inability to form the requisite intent to be convicted of capital murder.' Waldrop seems to argue that this should have been done because the defense's expert was not permitted to testify on the issue of intent. While it is true that the trial court limited Dr. Tackett's testimony on that element, the record also reflects that the witness did discuss the effects of cocaine and cocaine addiction on a person. In one exchange on direct examination, the following occurred:
 "Q: And, okay — and, do you have an opinion as to — concerning the role of drugs in the death of Mr. and Mrs. Prestridge in this case?
 "A: My opinion is that what the drugs did was that — as I just mentioned earlier — that the craving, the results — the deaths resulted as a result of wanting to get the necessary funds to buy the drugs. That the individuals were killed in order to get the money in order to purchase enough drugs to get out of the craving stage.
 "This testimony relates directly to the definition of `intentional' in Ala. Code, Section 13A-2-2, which states `[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result [murder as the State asserts or robbery as the defense asserts] or to engage in that conduct.' The `result' that Dr. Tackett's testimony suggested, i.e., theft or robbery, would have reduced the charge to felony murder. Therefore, Waldrop's claim does not create a material issue of fact or law that would entitle him to relief, Rule 32.7(d), nor can he show that his counsel's action was unreasonable or affected the outcome of the proceeding."
(C.R. 200-03.)
When this issue was raised at the Rule 32 hearing, the following occurred:
 "[Counsel]: Just for the record, Your Honor, Dr. Martha Loring is a licensed certified social worker with expertise in trauma and abuse who interviewed Bobby Waldrop, other informants, as well as reviewed records. And she would have testified about the severe and chronic violence in Bobby's household, the trauma that he underwent as a child and during the time of this offense, the neglect and rejection that he suffered as a child, acute crises that predate his cocaine abuse.
 "The Court: Acute?
 "[Counsel]: Acute crises including the loss of his child, the loss of his car, and also the arrest.
 "The Court: So you're saying . . . not to interrupt you. Because I know it's hard to sail when somebody takes the wind. But she would simply recite what testimony I've already heard from the actual witnesses?
 "[Counsel]: She would discuss that testimony, Your Honor, and then explain to the Court the significance of those events and those factors in Bobby's childhood.
 "The Court: All right. And Dr. Tarter?
 "[Counsel]: As to Dr. Tarter, Dr. Tarter is a clinical neuropsychologist [and has] reviewed records and interviewed other informants. He would be testifying with respect to statutory mitigating circumstances that Bobby suffered from a mental disease or defect at the time of the offense;
namely, substance abuse disorder with dependency on cocaine and explain to the Court that that is a chronic *Page 1193 
disease of the brain and a neuropsychiatric illness which would have had an effect on Bobby's behavior at the time of the offense."
(R. 419-20) (emphasis added).
The transcript of Waldrop's trial shows that a mental evaluation was conducted on Waldrop before trial to determine his mental competency to stand trial and his mental state at the time of the murders. Waldrop was evaluated by a clinical psychologist. It was this expert's opinion that Waldrop was competent to stand trial and that he was not suffering from a mental disease at the time that he committed the murders.Waldrop, 859 So.2d at 1169. The trial record also shows that. Waldrop's attorney at trial, Charles Gillenwaters, specifically stated that he was not going to pursue a mental-disease defense, because if he did the State said it was ready to rebut any evidence presented on this claim. Thus, trial counsel had no reason to retain another psychologist to dispute the first expert's findings. "A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." State v. Combs, 100 Ohio App.3d 90, 103, 652
N.E.2d 205, 213 (1994). See also State v. Frogge, 359 N.C. 228, 244-45, 607 S.E.2d 627, 637 (2005). "Counsel is not ineffective for failing to shop around for additional experts."Smulls v. State, 71 S.W.3d 138, 156 (Mo. 2002). "Counsel is not required to `continue looking for experts just because the one he has consulted gave an unfavorable opinion.'Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995)."Walls v. Bowersox, 151 F.3d 827, 835 (8th Cir. 1998). Thus, we agree with the court that there was no "material issue of fact or law that would entitle [Waldrop] to relief on this issue. Therefore, the court did not err in excluding Dr. Tarter's testimony at the Rule 32 hearing.
Moreover, the court did not err in excluding the testimony of the social worker. As the court noted, her testimony was cumulative of other evidence that had already been presented at the evidentiary hearing. "The exclusion of admissible evidence does not constitute reversible error where the evidence `would have been merely cumulative of other evidence of the same nature, which was admitted.'" Houston v. State,565 So.2d 277, 281 (Ala.Crim.App. 1990), quoting Ex parteLawson, 476 So.2d 122, 122 (Ala. 1985).[5]
Furthermore, the record shows that Waldrop failed to comply with the court's order to submit a statement of the experts' expected testimony. Before the evidentiary hearing the court directed Waldrop to "submit a statement concerning the testimony expected by each witness who is to be subpoenaed by them and an explanation as to why this testimony is material." (C.R. 253.) The State objected to Waldrop's information concerning the two experts and moved for a more definite statement as to their expected testimony. (C.R. 304.) The court granted this motion. (C.R. 310.) However, Waldrop failed to comply with this order. Accordingly, the court did not abuse its discretion in excluding the testimony of Dr. Loring and Dr. Tarter.
 III.
Waldrop next argues that his counsel's performance at the penalty phase of his capital-murder trial was ineffective. Specifically, he asserts that counsel failed *Page 1194 
to investigate and present mitigation evidence concerning his abusive childhood, his neglectful mother, and the facts that his cocaine addiction stemmed from a history of substance abuse and that he showed promise when he was in a stable environment.
When reviewing claims of ineffective assistance of counsel, we apply the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show: (1) that counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' See Michel v. Louisiana, [350 U.S. 91], at 101 [(1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. 2052. As the United States Supreme Court further stated:
 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."
466 U.S. at 690-91, 104 S.Ct. 2052.
 "`When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is "a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland [v. Washington], 466 U.S. [668,] at 695, 104 S.Ct. [2052,] at 2069 [(1984)].'
"Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir. 1994).
 "`"A defense attorney is not required to investigate all leads, however, and `there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in the penalty phase of a *Page 1195 
capital case.'" Bolender [v. Singletary], 16 F.3d [1547,] at 1557 [(11th Cir. 1994)] (footnote omitted) (quoting Devier v. Zant, 3 F.3d 1445, 1453 (11th Cir. 1993), cert. denied, [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087
(1995)). "Indeed, `[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel'" Bolender, 16 F.3d at 1557 (citations omitted).'
"Marek v. Singletary, 62 F.3d 1295, 1300 (11th Cir. 1995). "Last, the United States Supreme Court inWiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527,156 L.Ed.2d 471 (2003), reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:
 "`In Strickland [v. Washington, 466 U.S. 668
(1984)], we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.' "539 U.S. at 534, 123 S.Ct. 2527."
Gaddy v. State, 952 So.2d 1149, 1170-71
(Ala.Crim.App. 2006).
 "The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. E.g. Commonwealth v. Uderra, 550 Pa. 389, 706 A.2d 334, 340-41 (1998) (collecting cases). Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel."
Commonwealth v. Bond, 572 Pa. 588, 609-10,819 A.2d 33, 45-46 (2002).
Waldrop was represented at trial by attorney Charles Gillenwaters. Gillenwaters testified at the Rule 32 hearing that he had been practicing law since 1978 and that he was appointed to represent Waldrop in March 1999. He said that approximately 60% of his practice was in criminal law and that he had worked on 13 or 14 capital cases — 3 or 4 of which had gone to trial. He testified:
 "[Counsel]: And what specifically did you do?
 "[Gillenwaters]: You have all of the motions that I filed. I spoke with Bobby numerous times at the jail. I spoke with I believe mainly his mother, because this case, much of the family was not very cooperative and did not want to assist Bobby in any way. Basically, his mother was my source for the family."
(R. 48.) Gillenwaters said that he spoke with one of Waldrop's sisters and Waldrop's employer, examined Waldrop's prison records, and attended part of Waldrop's codefendant's trial, and obtained a transcript of that trial. He retained an expert, Dr. Randall Tackett, a doctor of pharmacology, to testify about the effects of cocaine addiction. It was the expert's opinion that Waldrop was under the influence of cocaine when he committed the murders. Gillenwaters further testified that he considered the cocaine addiction to be the strongest mitigating factor and that he contacted the Southern Center for Human Rights and that that organization gave him Dr. Tackett's name. The following occurred on cross-examination:
 "[Assistant attorney general]: Now, let me ask you. With regard to the mitigator *Page 1196 
on the cocaine addiction, did you make some judgment as to whether you should present other mitigating factors or facts?
 "[Gillenwaters]: Yes, I did.
 "[Assistant attorney general]: And tell me about that.
 "[Gillenwaters]: Well, I reviewed Judge Segrest's order the other day, the one when it was sent back. And I felt that the strongest jury argument was the cocaine addiction. And I know that with the sentencing phase, we did argue that he came from a broken family, his age, and the fact that he had no prior criminal record. And I think those were all factors that I considered. But I think that you had to overcome in this case the fact that he, indeed, did kill his grandparents. And the chilling part of this or the really difficult thing was the pictures, the video scene of the case, all of that went to 12 people here that were probably very shocked by that. And then you had Bobby's confession where he said — and, you know, I haven't seen the transcript of the trial. But I know that he said in that videotape that, `[B]efore I cut my grandmother's throat she looked up at me and said, I love you, son. And I knew that was very graphic, very hard to overcome. And the only way that I felt that we could do that was to show that he lost his will to be — to, you know, he needed the $600 or $700 that his grandparents had to buy crack cocaine for he and Clara. And, if it meant killing them, that's what the addiction called for. And I felt that the jury could understand that, and I thought that the judge could understand that, also. But I know — I think sometime the judge turned that — turned the addiction into maybe an aggravator of some sort. I know he said that a couple of times.
 "[Assistant attorney general]: So you evaluated the information you had. And would it be a fair statement to say that you decided that the cocaine addiction was the strongest mitigator that you should focus on?
 "[Gillenwaters]: Yes.
 "[Assistant attorney general]: Now, when you spoke to Bobby and you said that you have a good rapport with him and met with him on a number of occasions, did he indicate to you that he was, in fact, raised by his grandparents? "[Gillenwaters]: Yes.
 "[Assistant attorney general]: Did he ever indicate to you that he had been abused in any manner by any individual? "[Gillenwaters]: No.
 "[Assistant attorney general]: Did he indicate to you that as far as his parents, Shirley and Wesley Waldrop, that they did not have much to do with him? "[Gillenwaters]: Yes. He indicated that his grandparents were his providers and raised him mainly his entire life. That his parents lived here or together. They lived with his grandparents, and so did he. And that basically was his life, either living by them, next to them, or with them his entire life."
(R. 65-67.)
"Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact." Chandler v. United States, 218 F.3d 1305,1320 (11th Cir. 2000). A review of the record shows that at the guilt phase Gillenwaters called Waldrop's mother and several other witnesses to testify. Waldrop's mother said that she had had Waldrop when she was 14 years old, that she did not know how to care for a child, that Waldrop's father was not responsible, and that Waldrop lived the majority of his life with her parents, the victims. *Page 1197 
At the sentencing hearing, Gillenwaters asserted that Waldrop had no significant history of criminal activity, that Waldrop had been under the influence of cocaine when he committed the murders, that he could not appreciate the criminality of his actions, that he was only 19 years of age at the time of the murders, that he came from a broken home, that he worked well with others, and that he was remorseful for his actions.
Dr. Tackett testified at sentencing that the use of crack cocaine changes a person's brain chemistry and that it was his opinion that Waldrop was on cocaine when he committed the murders. He said that Waldrop was suffering extreme mental or emotional disturbance at the time of the murders because of his addiction to cocaine. Bobby Waldrop testified at sentencing that at the time of the murders he was under the influence of cocaine and heroin. The following occurred:
 "[Defense counsel]: Why did you kill them?
 "[Waldrop]: On account of the drugs I was using. I love my grandparents very much and at that time I was on these drugs — I mean I was not — I wasn't the person that I am now. I mean, it was like this was all I cared about. I didn't care about my family. I didn't care about my wife. I didn't care if I hurt myself or anybody else.
(R. 1030.) Sheriff Jeff Fuller also testified that he was responsible for the Randolph County jail and that for the four months Waldrop had been in jail awaiting trial Waldrop had caused no problems.
When denying relief on this claim, the circuit court made the following findings of fact:
 "Mr. Waldrop's trial counsel, Charles Gillenwaters, testified that Mr. Waldrop, with whom he had a good rapport, never told him that anyone had ever abused him. The Strickland Court held that the defendant's own statements or actions are a significant factor in determining the reasonableness of a trial counsel's actions. Strickland, 466 U.S. at 691. Further, Mrs. Irelan [Waldrop's mother] testified that she told Mr. Gillenwaters that Mr. Waldrop's father abused him and that Mr. Waldrop's father hit her and that they had fights. Mrs. Irelan was never asked by either attorney how much detail she provided Mr. Gillenwaters, but on cross-examination she did confirm that she did provide this information to him.
 "In support of his allegation that there was mitigating evidence that Mr. Gillenwaters failed to present Mr. Waldrop submitted Mrs. Irelan's testimony, without corroborating evidence, that her father Sherrell Prestridge, one of the victims in the case, beat her on many occasions, even while [she was] pregnant. Even if the Court were to assume this did occur, it would have been a risky strategy at best for Mr. Gillenwaters to have offered at Mr. Waldrop's trial that the actions of the victim (Mr. Waldrop's grandfather, who had significant health problems, was robbed, and was stabbed to death with 43 wounds) toward the defendant's mother some 12 to 13 years before the crime was a circumstance that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without eligibility for parole instead of death. . . . `It is presumed that jurors do not leave their common sense at the courthouse door,' Ex parte Rieber, 663 So.2d 999, 1006 (Ala. 1995) (paraphrasing Justice Souter's concurring opinion in Payne v. Tennessee, 501 U.S. 808 (1991)) and `common sense' should not be abandoned when evaluating Mr. Waldrop's claims. Regardless, *Page 1198 
the Court did not find Mrs. Irelan's testimony credible on this issue. She clearly has an interest in the outcome of this hearing — Mr. Waldrop is her son and she has already lost her parents. Mr. Waldrop's own witness, the Prestridges' and Waldrop's neighbor, Phyllis Lipham, testified that she never saw Mr. Prestridge hit his children. Mr. Waldrop did not produce any corroborating documents of Mrs. Irelan's claim that she lost a baby after one of the alleged beatings or her claim that a teacher observed blood on her dress while at school. Additionally, Mr. Waldrop did not call to testify Mrs. Irelan's two sisters who were present in court the day of the hearing and on his witness list, one of whom Mrs. Irelan testified, was also `beat' by their father, to corroborate Mrs. Irelan's testimony.
 "The Court fails to see how the other evidence offered by Mr. Waldrop concerning violent acts allegedly perpetrated on his father and his father's sister (Mr. Waldrop's aunt) by the uncle they were raised by is relevant, to `any aspect of [Mr. Waldrop's] character or his record.' See, e.g. Beckworth v. State, [946 So.2d 490] (Ala.Crim.App. 2005) (evidence that Beckworth's father was currently charged with sexually abusing Beckworth's daughter was irrelevant); California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring specially) (`[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.') Even if the Court were to believe this evidence, it all happened before Mr. Waldrop's birth and apparently Mr. Waldrop was not aware of it. This Court cannot find that Mr. Gillen-waters was deficient in not presenting irrelevant and unbelievable testimony.
 . . .
 "The `major' mitigator that Mr. Gillenwaters presented in Mr. Waldrop's trial was Mr. Waldrop's addiction to cocaine. Mr. Gillenwaters testified at the evidentiary hearing that he obtained the services of an expert on cocaine addiction after consultation with the Southern Center for Human Rights, an organization that assists attorneys who are representing capital defendants. In fact, it was that organization that sent Mr. Gillenwaters the information about the expert he ultimately used. Mrs. Irelan testified at the hearing that she spoke to Mr. Gillenwaters before trial and told him about Mr. Waldrop's loss of his baby and that Mr. Waldrop had been arrested right before he began to use cocaine. At the penalty phase of his trial, Mr. Waldrop testified that he used crack cocaine, heroin, and methamphetamines. Despite Mr. Gillenwaters's knowledge about his cocaine addiction and problems that preceded the homicides, Mr. Waldrop claims that Mr. Gillenwaters should have presented testimony concerning his family's `history of substance abuse.'
 "Whether Mrs. Irelan's grandfathers were `bootleggers' or that she had seen an uncle of hers `driving drunk' or that the aunt and uncle who raised Mr. Waldrop's father drank, all of whom were apparently deceased before Mr. Waldrop's birth or shortly thereafter, is irrelevant to Mr. Waldrop's character or record. See Beckworth, supra. To classify Wesley Waldrop's drinking as `excessive' (Waldrop's Brief, page 37) is a gross overstatement of the evidence. Wesley's sister testified that he used to *Page 1199 
drink two or three beers when he came home from work and Mrs. Irelan testified that he drank on the weekends and sometimes came home during the week with a 6 or 12 pack of beer. In discussing the use of alcohol by other family members, Mr. Waldrop's witness, Phyllis Lipham, testified that `by the time Bobby got older, Sherrell [Prestridge] had quit drinking.' Mrs. Lipham also said that she didn't `really know of definite' if Wesley Waldrop . . . drank. This Court cannot find that Mr. Gillenwaters was deficient in not presenting this kind of testimony.
 ". . . .
 "Freddie Whitley, Barrett Holloway, Phyllis Lipham, and Retha McGehee, all of whom were called by Mr. Waldrop, never saw any marks or bruises on Mr. Waldrop, never saw anyone hit or strike him, and never observed Mr. Waldrop appear to be hungry or without proper clothing. These witnesses were Mr. Waldrop's preacher, teacher, neighbor, and aunt. If there had been `daily fights' between Mr. Waldrop and his father involving hitting with fists and hands and choking or being hit with belt buckles someone would have noticed something. Considering the source of this `evidence,' Mr. Waldrop's mother and sister (who has been convicted of crimes that affect the credibility of a witness, see Rule 609, A.R.Evid.), the testimony about abuse appears to be greatly exaggerated.
 "With regard to doing well in `structured environments,' Mr. Waldrop was in the seventh grade three times and he was fired from work on three occasions for being excessively absent. When Mr. Waldrop came to church he would come with his parents (the same people he now claims abused him), his siblings, and `occasionally sometimes with his grandparents.' Although Mr. Waldrop played the drums and was very active in church his overall claim of `stability' is undermined by the need to repeat a grade in school and his inability to maintain a job.
 "Any witness who saw Mr. Waldrop interact with his grandparents testified that he loved them and they loved him. However, the Court is unclear why Mr. Waldrop would propose his love and caring for his grandparents as mitigating evidence when he inflicted over 80 knife wounds to these same two people so that he could obtain their money to go buy cocaine. His own taped statement indicated that Mrs. Prestridge told him she loved him as he cut her throat to finish her off. There is no doubt that the jury and Judge Segrest knew that his grand-parents loved him and wanted better for him. It is also clear to the Court that his love and caring for them would have rung hollow and been potentially devastating to his success in avoiding the death penalty. An experienced attorney like Mr. Gillenwaters, experienced with capital cases as well as with Judge Segrest, would have recognized this. See e.g., Spaziano v. Singletary, 36 F.3d 1028, 1040 (11th Cir. 1994).
 "In sum, this Court does not find the `evidence' presented by Mr. Waldrop at his evidentiary hearing to be particularly credible or relevant. The testimony did not provide any additional credible mitigating circumstances that Mr. Gillenwaters either failed to discover or present.
 "Further, although not controlling, the Court does find significant that the strategy employed by Mr. Gillenwaters did obtain a jury recommendation of life without parole by a vote of 10 to 2. See, Burgess v. State, 962 So.2d 272 (Ala.Crim.App. 2005); Giles v. State, 906 So.2d 963
(Ala.Crim.App. 2004), cert. denied, *Page 1200 906 So.2d 991 (Ala. 2005), overruled on other grounds, [Ex parte Jenkins, 972 So.2d 159] (Ala. 2005). If Mr. Gillenwaters had presented the testimony that Mr. Waldrop offered at the Rule 32 evidentiary hearing it is conceivable to this Court that the jury would have lost the significance of the cocaine addiction and become angered that Mr. Waldrop was trying to blame his actions on one of the deceased victims (Sherrell Prestridge), his mother, his father, or his `family's history' of alcohol and drug use. Thus, Mr. Gillenwaters strategic decision to focus on his `strongest jury argument' was not unreasonable and was effective with the jury. Based on the evidence produced at the hearing, Mr. Gillenwaters had discovered most of the information that Mr. Waldrop claims he did not have and therefore his investigation was not unreasonable. It is this Court's opinion that Mr. Gillenwaters acted reasonably and that the result of Mr. Waldrop's trial would not have been different."
(C.R. 851-56.)
The circuit court's findings are supported by the record, and we adopt them as part of this opinion. Few witnesses at the evidentiary hearing offered any negative insight into Waldrop's upbringing except his mother. The majority of her testimony consisted of detailing the abuse that she had suffered at the hands of her father, one of the victims, and her husband. Furthermore, as explained below, it is conceivable that evidence of an abusive childhood environment would have hurt Waldrop given that he was charged with killing his grandparents — the two people who were his primary caregivers during his childhood.
As the Florida Supreme Court stated in Reed v. State,875 So.2d 415, 437 (Fla. 2004):
 "An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword. See, e.g., Carroll v. State, 815 So.2d 601, 614-15 
n. 15 (Fla. 2002); Asay v. State, 769 So.2d 974, 988 (Fla. 2000)."
See also Foster v. Ward, 182 F.3d 1177, 1189 (10th Cir. 1999) ("We have on numerous occasions determined that evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction and evidence supporting multiple aggravating circumstances; nor does evidence of low I.Q. and/or organic brain damage."). As the United States Supreme Court inBurger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114,97 L.Ed.2d 638 (1987), stated:
 "`On one hand, a jury could react with sympathy over the tragic childhood [the defendant] endured. On the other hand, since [the defendant's] sanity was not in issue in this case, the prosecution could use this same testimony, after pointing out that petitioner was nevertheless responsible for his acts, to emphasize that it was this same unpredictable propensity for violence which played a prominent role in the death of [the defendant's] victim. "[M]itigation . . ., after all, [m]ay be in the eye of the beholder." Stanley v. Zant, 697 F.2d 955, 969 n. 11 (11th Cir. 1983) (footnote omitted).'"
(Quoting Burger v. Kemp, 753 F.2d 930, 937-38 n. 7 (11th Cir. 1985).)
On appeal, Waldrop relies on the case of Wiggins v.Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471
(2003), to support his claim that his counsel's investigation was unreasonable. In Wiggins v. Smith, the United States Supreme Court stated:
 "In finding that [trial counsel's] investigation did not meet Strickland's performance standards, we emphasize that *Page 1201 Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the `constitutionally protected independence of counsel' at the heart of Strickland, 466 U.S., at 689. We base our conclusion on the much more limited principle that `strategic choices made after less than complete investigation are reasonable' only to the extent that `reasonable professional judgments support the limitations on investigation.' Id., at 690-691. A decision not to investigate thus `must be directly assessed for reasonableness in all the circumstances.' Id., at 691.
 "Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records — evidence that would have led a reasonably competent attorney to investigate further."
539 U.S. at 533-34, 123 S.Ct. 2527. As the Florida Supreme Court stated in Reed v. State:
 "[T]he instant case is distinguishable from Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in which the United States Supreme Court found the decision of Wiggins' counsel not to expand their investigation into mitigation fell below the prevailing professional standards. The primary concern in Wiggins was that Wiggins' counsel's failure to thoroughly investigate `resulted from inattention, not reasoned strategic judgment.' Id. at 2537."
875 So.2d at 437. The Alabama Supreme Court in Ex partePerkins, 941 So.2d 242, 249 (Ala. 2006), noted that the holding in Wiggins concerned "trial counsel's completefailure to discover and present . . . mitigating evidence [concerning a dysfunctional family]." "UnderWiggins, counsel may make strategic decisions to introduce, pursue or ignore certain evidence, but these decisions may amount to ineffective assistance if made based on an inadequate or unreasonable investigation." Byrom v.State, 927 So.2d 709, 717 (Miss. 2006).
 `"Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case.' Bunch [v. Thompson], 949 F.2d [1354] 1364 [(4th Cir. 1991)]. Therefore, `[t]he best course for a federal habeas court is to credit plausible strategic judgments.' Id. See also Truesdale v. Moore, 142 F.3d 749, 754-55 (4th Cir. 1998). To do otherwise would be a transparent misuse of the habeas court's power of hind-sight."
Lovitt v. True, 403 F.3d 171, 181 (4th Cir. 2005).
It is clear in this case that counsel conducted a reasonable investigation and chose not to concentrate on Waldrop's childhood. However, some evidence of Waldrop's childhood was introduced at trial. This case is distinguishable fromWig-gins, and that case does not mandate reversal.
Waldrop also contends that according to Harris v.State, 947 So.2d 1079 (Ala.Crim.App. 2004), he is entitled to a new sentencing hearing. In Harris, we held that counsel was ineffective for failing to investigate Harris's background to obtain mitigation evidence. Instead, counsel relied on "residual doubt," which we noted is not *Page 1202 
a mitigating circumstance, even though counsel had an abundance of mitigating evidence that he failed to discover and present.
Clearly, this is not a case where counsel failed to investigate, a case where counsel was ignorant of what evidence could be presented in mitigation, or a case where counsel presented no mitigation evidence. Gillenwaters was also aware that the sentencing judge, the same judge who had sentenced Waldrop's wife for the murders, had evidence of Clara Waldrop's abusive childhood and stated in his sentencing order that he afforded it little weight.[6] Gillenwaters made a reasoned strategic decision to portray Waldrop as the victim of his cocaine addiction. This defense was so effective that the jury recommended that Waldrop be sentenced to life imprisonment with the possibility of parole. Under the unique circumstances of this case, we hold that Gillenwaters's performance was not ineffective and that the court correctly denied relief on this claim.
 IV.
Waldrop next argues that he was denied a full and fair evidentiary hearing based on several different grounds.
 A.
Waldrop argues that the court erred in adopting, in its entirety, the State's proposed order denying relief. He argues: "The wholesale adoption of orders written by the State's lawyer in a death penalty case undermines both the reality and appearance of a fair, objective, and reliable process for imposing death." (Waldrop's brief at p.
In Hyde v. State, 950 So.2d 344 (Ala.Crim.App. 2006), we stated:
 "[T]his Court has repeatedly upheld the practice of adopting the State's proposed order when denying a Rule 32 petition for postconviction relief. See, e.g., Coral v. State, 900 So.2d 1274, 1288
(Ala.Crim.App. 2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala. 2005), and the cases cited therein. `Alabama courts have consistently held that even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.' McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App. 2003)."
950 So.2d at 371. In Morrison v. State, 551 So.2d 435
(Ala.Crim.App. 1989), we stated: *Page 1203 
"Morrison contends that the circuit court's wholesale adoption of the State's proposed findings of fact and conclusions of law was improper.
"This precise issue was decided unfavorably to the petitioner in Anderson v. City of Bessemer City, N.C.,470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), wherein the United States Supreme Court held `that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.'
 "`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake as been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746
(1948). . . . If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).' Id., 470 U.S. at 573-74, 105 S.Ct. at 1511."
551 So.2d at 436-37. For the reasons set out in this opinion we do not find the court's findings of facts clearly erroneous.
 B.
Waldrop further argues that he is entitled to a hearing on his judicial bias claim. Specifically, Waldrop asserted in his Rule 32 petition that Judge Segrest coerced Waldrop's sister, Christie Fortenberry, into testifying against him. Fortenberry testified about the contents of a letter Waldrop had written to his wife Clara that concerned the murders.
The circuit court stated the following when denying relief on this claim:
 "In paragraphs 244 through 248, Waldrop asserts that the trial judge was biased against him, and thus denied him a fair trial. The basis for this assertion is an allegation that the trial judge `called Ms. Fortenberry ex parte and told her that her testimony was important to the State's case because the letter was the only proof that the crime was premeditated.' This witness is Waldrop's sister, who testified in rebuttal for the State concerning a letter she retrieved from her father's home which was written by Waldrop to his wife, Clara. The Court finds that this claim is procedurally barred because this claim could have been raised at trial or on appeal. Rule 32.2(a)(3) and 32.2(a)(5). If the witness `remained unwilling to testify against Mr. Waldrop,' then the most logical participant in the trial to report this to would have been her brother's lawyer. If the event occurred and she told Waldrop's attorney, this could have been raised at trial or on appeal.
 "Additionally, the petition does not state when this alleged conversation between the trial judge and Waldrop's sister took place, how the trial judge was aware there was a letter, or when [Waldrop's] sister disclosed this information. For these reasons, this claim is denied because it is not sufficiently specific. Rule 32.6(b). *Page 1204 
"Further, Waldrop has failed to affirmatively show that there was any bias on the part of the trial judge. In a hearing outside the presence of the jury, the trial judge allowed the first page of the letter to be introduced by the State, but suppressed the second page of the letter, ruling that there was improper state action in obtaining it. If, as it is alleged, the trial judge was biased against Waldrop, this action would be inconsistent. Therefore, this claim is also denied because it fails to state a claim. Rule 32.7(d)."
(C.R. 213-14.) The court correctly found that this claim was procedurally barred because it could have been raised at trial or on appeal. See Rule 32.2(a)(3) and (a)(5), Ala.R.Crim.P.
Moreover, Fortenberry testified at the Rule 32 hearing that she met with the prosecutor before trial, that he encouraged her to testify, and that she felt coerced. She said that at the meeting "It was just me and him for a little while, and then I seen Mr. Segrest." (R. 392.) There was no indication that Judge Segrest had had any unlawful contact with Fortenberry, much less that he coerced Fortenberry to testify. Thus, relief was properly denied on this claim.
 C.
Waldrop next argues that the circuit court erred in denying hisBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963), claim. In Waldrop's Rule 32 petition, he alleged:
 "The State in this case withheld exculpatory information favorable to the defense, including facts about Shirley Irelan's prior dealings with the prosecutor's office, in violation of Mr. Waldrop's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the Alabama Constitution, and Alabama State law."
(C.R. 58.)
When denying relief on this claim the court stated:
 "The claim states that the exculpatory information withheld concerned `facts about Shirley Irelan's [Waldrop's mother] prior dealings with the prosecutor's office. . . .' Since there is no additional information provided in this claim, the Court assumes that Waldrop must be referencing prior convictions of the witness. . . . This would not be exculpatory. Ms. Irelan testified as a defense witness in the guilt phase of the trial. During the cross-examination of Ms. Irelan, the State did not bring out any `prior dealings with the prosecutor's office.' Therefore, no harm befell Waldrop at the trial. For this reason, this claim fails to show that a material issue of fact or law exists that would entitle Waldrop to relief, Rule 32.7(d)."
(C.R. 213.) "We have held in Alabama in a number of cases that a defendant is not entitled to the general disclosure of the criminal records of the state's witnesses." Hardy v.State, 804 So.2d 247, 286 (Ala.Crim.App. 1999). Accordingly, Waldrop was due no relief on this claim.
 D.
Waldrop next argues that the court erred in summarily denying his claim that several jurors failed to answer questions truthfully during voir dire examination.
The court stated the following:
 "With regard to [the juror-misconduct claims] the Court finds that these claims are procedurally [barred] by Rule 32.2(a)(3) and Rule 32.3(a)(5), in that the claims raised in each section could have been raised at trial or on appeal. Although the trial court prohibited the *Page 1205 
parties from contacting jurors prior to jury selection. See June 3, 1999 order (CR. 141-145), nothing prohibited counsel from speaking with the jurors after their deliberations were completed and they were excused. This could have occurred prior to the sentencing hearing before the judge the time for a motion for new trial expired. See Woods v. State, 957 So.2d 492 (Ala.Crim.App. 2004).
 "In addition to the procedural bar discussed above, the Court further finds that these claims are not sufficiently specific and are subject to being denied for that reason. Waldrop's petition discusses an individual juror in each section of this claim. Most of the allegations concern the juror `knowing' some named person, but not disclosing that information. For example, Juror A.W. is supposed to know the assistant district attorney Melody Baldwin and her husband, while juror H.S. is supposed to know Sheriff Jeff Fuller. However, Waldrop does not indicate how or when he discovered `the relationships' existed, when they occurred, or whether they might have had any effect on the juror's ability to remain unbiased. Also, juror W.H. acknowledged that he knew Sheriff Fuller but was not struck. Similarly, juror W.W. is supposed to know circuit clerk Kim Benefield through `filing legal papers.' A relationship such as this is not the kind of `knowledge' that would influence a juror. Additionally, two people who remained on the jury acknowledged knowing Ms. Benefield — juror A.K. and alternate C.S. It should also be noted that two of the sections (D and G) concern the two alternates, juror C.S. and juror M.S. A juror who is dismissed before deliberations begin would not be in a position to improperly influence those deliberations. See Reeves v. State, 807 So.2d 18, 32
(Ala.Crim.App.), cert. denied, 534 U.S. 1026 (2001). For these reasons, this claim is denied, because it is not sufficiently specific, Rule 32.6(b), and because there is no material issue of fact or law that would entitle the petitioner to relief. Rule 32.7(d)."
(CR. 213.)
 "The Alabama Supreme Court in [Ex parte] Pierce, [851 So.2d 606 (Ala. 2000),] stated that in order for a juror-misconduct claim to be cognizable in a Rule 32 proceeding the petitioner must establish `that the information was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal.' Pierce, 851 So.2d at 616. Jenkins failed to meet his burden under Rule 32.3, Ala.R.Crim.P."
Jenkins v. State, 972 So.2d 165, 167-68
(Ala.Crim.App. 2005) (on remand from the Alabama Supreme Court). The record shows that Waldrop failed to meet his burden under Rule 32.3, Ala.R.Crim.P.; thus, relief was correctly denied on this claim.
 E.
Waldrop next asserts that the court erred in summarily denying portions of his ineffective assistance of counsel claim. This section of Waldrop's brief consists of general assertions but only specifically identifies a few claims. Because we do not review a postconviction petition under the plain error standard of review, we will address only those issues that are specifically argued in this section of Waldrop's brief.
 1.
Waldrop first argues that the court erred in individually denying subcategories of his ineffective-assistance-of-counsel claim without considering the claim in its entirety. *Page 1206 
However, in Coral v. State, 900 So.2d 1274, 1284
(Ala.Crim.App. 2004), overruled on other grounds, Ex parteJenkins, 972 So.2d 159 (Ala. 2005), we stated: "[T]he claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories. Each subcategory is a independent claim that must be sufficiently pleaded." Thus, the court's ruling is consistent with our holding in Coral.
 2.
Second, Waldrop argues that "the adopted order makes merits determinations that are simply unsupported by the record and base[d] its conclusions on assumptions and errors that Mr. Waldrop was entitled to rebut factually at an evidentiary hearing." (Waldrop's brief at p. 77.) He specifically asserts that the court erroneously concluded that his claim that counsel failed to investigate mental-health evidence was without merit because Waldrop had had a mental evaluation before trial. After reviewing the record, we cannot agree with Waldrop's assessment of this issue.
When denying relief the court made the following findings:
 "In paragraph 154, Waldrop asserts a `bare allegation' that his counsel did not investigate `mental health evidence.' This claim is procedurally defaulted because it was addressed on appeal. Rule 32.2(a)(4), A.R.Crim.P. Procedural bars apply in capital cases even where the death penalty is imposed. See, e.g., State v. Tarver, 629 So.2d 14, 19
(Ala.Crim.App.), appeal after remand 637 So.2d 231
(Ala.Crim.App. 1994), cert. denied 511 U.S. 1078
(1994). The record reflects that the trial court ordered an outpatient evaluation to `conduct a clinical evaluation of the Defendant's competency to stand trial and mental state at the time of the offense.' On appeal, Waldrop argued that `trial counsel should have presented the testimony of a psychologist or psychiatrist concerning his mental state at the time of the offense.' Waldrop, 859 So.2d at 1169. The Court of Criminal Appeals held:
 "`Our review of the record reveals that the error Waldrop alleges concerning his trial counsel's performance does not rise to the level of plain error. Given that a certified forensic medical examiner conducted a mental evaluation of Waldrop, and indicated that, in his opinion, Waldrop was competent at the time the offenses occurred, Waldrop's trial counsel's decision not to present testimony of a psychologist or psychiatrist was consistent with sound trial strategy.' (Emphasis added.)
"Waldrop, 859 So.2d at 1171. Therefore, counsel did investigate mental-health evidence and made a `sound trial' decision not to present it to the jury.
"Also, this claim is dismissed because it is without merit. Rule 32.7(d). At trial, and after the court-ordered evaluation had been completed, counsel indicated that the defendant was not pursuing a mental health defense. The State stood ready to rebut any argument on that issue. Further, the Report for Youthful Offender Investigation stated that Waldrop had `never been in a mental institution, under the care of a psychiatrist, nor in any type of counseling program' (Supplement Record [Youthful Offender] Investigation Report, p. 4). Counsel is permitted to rely on the information presented to him during the course of a case, and make decisions based on that information. See De-Bruce v. State, [890 So.2d 1068
(Ala.Crim.App. 2003)]. Because there was an *Page 1207 
 investigation, this claim is without merit."
(C.R. 200-01.)
We note that the court erroneously concluded that a finding of plain error concerning a substantive issue underlying a claim of ineffective assistance of counsel precluded Waldrop from raising the same claim as an ineffective-assistance-of-counsel claim. The Alabama Supreme Court in Ex parte Taylor, [Ms. 1040186, September 30, 2005] ___So.2d ___, ___ (Ala. 2005), stated:
 "Although it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland test will result in different outcomes, a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel. In determining whether to grant a Rule 32 petitioner relief on an ineffective-assistance claim, a court must examine both the plain-error and prejudice standards of review."
Nonetheless, the court specifically addressed this issue and found it to be without merit. The record supports the court's findings.
 3.
Third, Waldrop argues that the court erred in not allowing him to present evidence in support of his claim that counsel was ineffective for failing to challenge Waldrop's statement to police as the fruit of an illegal arrest.
The court made the following findings:
 "In paragraphs 164 through 168, Waldrop asserts that his trial counsel should have challenged the admission of his statement based on an illegal arrest which occurred `where he lived.' The testimony throughout the trial was that Waldrop lived at his grandparents' home. Since the arrest was not at Waldrop's home, no Payton [v. New York, 445 U.S. 573 (1980)] violation could have occurred and a reasonable attorney would not have spent time on this issue. See Gates v. Zant, 863 F.2d 1492, 1498 (11th Cir. 1989), cert. denied, 493 U.S. 945 (1989) (`Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all lines of defense. A reasonably competent attorney often must reply on his own experience and judgment, without benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense.') This claim is denied because no material issue of fact or law exists which would entitle Waldrop to relief. Rule 32.7(d)."
(C.R. 203.) We agree that there was no material issue of fact or law that would warrant relief on this claim. Thus, this claim was correctly summarily denied.
 4.
Fourth, Waldrop argues that the court erred in denying several of his allegations of ineffective assistance of counsel because this Court had found no plain error on direct appeal. He citesEx parte Taylor, supra, in support of this contention. In his one-paragraph argument, Waldrop fails to identify any specific claim he specifically challenges on appeal. We do not apply the plain-error standard of review to a postconviction proceeding attacking a death sentence. See Hunt v.State, 940 So.2d 1041 (Ala.Crim.App. 2005).
Moreover, our review of the court's order reflects that the court barred only one claim of ineffective assistance of counsel because the substantive issue underlying the claim had been raised and addressed *Page 1208 
on direct appeal. However, the court also denied this claim on the merits. (See our discussion in Part III.E.2. of this opinion.)
 5.
Fifth, Waldrop argues in one paragraph in this section of his brief that the court erroneously found that several of his claims of ineffective assistance of counsel were without merit because the jury returned a recommendation of life imprisonment without parole. He cites Ex parte Hodges,856 So.2d 936 (Ala. 2003), in support of this assertion.[7] Again, Waldrop does not identify any specific issue that he challenges on appeal.
Moreover, the court in its order denying the petition stated: "Further, although not controlling, the Court does find significant that the strategy employed by Mr. Gillenwaters did obtain a jury recommendation of life without parole by a vote of 10 to 2." (C.R. 856) (emphasis added).
For the foregoing reasons, we affirm the circuit court's denial of Waldrop's petition for postconviction relief.
AFFIRMED.
BASCHAB, P.J., and McMILLAN and WISE, JJ., concur.
SHAW, J., concurs in the result.
[1] Waldrop's wife, Clara Waldrop, was also indicted and convicted of capital murder. She was sentenced to life imprisonment without the possibility of parole.
[2] This Court takes judicial notice of our prior parteSalter, 520 So.2d 213, 216 (Ala.Crim. records in Waldrop's direct appeal. See Ex App. 1987).
[3] This section of Waldrop's brief consists primarily of citations to parts of the record where Waldrop alleges the Rule 32 court erroneously excluded evidence.
[4] Waldrop's mother was also allowed to testify that she loved her son and "couldn't handle losing" him before an objection was made.
[5] One court has noted that "the decision to hire a social worker appears to be second-guessing by current counsel, rather than identification of a defect in trial counsel's strategy."Gudinas v. State, 816 So.2d 1095, 1108
(Fla. 2002).
[6] Judge Segrest stated the following in his order sentencing Clara Waldrop to life imprisonment without the possibility of parole: "Defense counsel argues that the court should take into consideration as a mitigator the fact that the defendant was raised in a broken home. The court finds that the defendant's background is a mitigating circumstance, but this mitigator carries little weight. It would be ironic for the courts to determine that environmental factors which cause people to become violent offenders should then be taken into consideration to make these people less susceptible to the death penalty." (C.R. 1268.)
Also, when this Court remanded Waldrop's direct appeal for the circuit court to correct its sentencing order, the circuit court stated: "Defense counsel argues that the court should take into consideration as a mitigator the fact that the defendant was raised in a broken home. The court finds that the defendant's family background is not a mitigating circumstance. It would be ironic for the courts to determine that environmental factors which cause people to become violent offenders should then be taken into consideration to make these people less susceptible to the death penalty. If a defendant comes from a broken family, counsel argues that this is a mitigating circumstance. If he comes from a good, unbroken family, then this would be argued as a mitigating circumstance."
[7] In Hodges, the Alabama Supreme Court stated: "Hodges is correct that the number of jurors voting for life imprisonment is a factor this Court now requires a trial court to consider in weighing the aggravating circumstances against the mitigating circumstances in a case in which a sentence of death is a possibility." 856 So.2d at 947.
 *Page 367