**Bobby Wayne WALDROP, Petitioner-Appellant,**

v.

**COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS, Attorney General, State of Alabama, Warden, Respondents-Appellees.**

No. 15-10881

United States Court of Appeals, Eleventh Circuit.

(September 26, 2017)

Randall S. Susskind, Bryan A. Stevenson, Aaryn M. Urell, Equal Justice Initiative of Alabama, Montgomery, AL, for Petitioner-Appellant

James Clayton Crenshaw, Andrew Lynn Brasher, Alabama Attorney General's Office, Montgomery, AL, for Respondents-Appellees

Before MARCUS, MARTIN, and JORDAN, Circuit Judges.

PER CURIAM:

In 1998, Bobby Waldrop stabbed his grandparents to death. An Alabama jury convicted him of three counts of capital murder, and the trial court sentenced him to death over the jury's recommendation of life imprisonment. Mr. Waldrop's direct state appeals and state postconviction collateral challenges proved unsuccessful. This is Mr. Waldrop's appeal from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.

We address three issues: whether Mr. Waldrop was denied effective assistance of counsel at sentencing; whether the trial court took Mr. Waldrop's race into account when it decided to impose the death penalty; and whether the trial court violated Mr. Waldrop's Sixth Amendment right to a trial by jury when it rejected the jury's 10-2 recommendation of life imprisonment and imposed a sentence of death. Following a review of the record, and with the benefit of oral argument, we affirm the district court's denial of habeas relief.

## I

To place Mr. Waldrop's claims in context, we begin with the facts and procedural history.

## A

Mr. Waldrop was born to a 14-year-old mother who often left him for days and weeks at a time. He spent much of his childhood with his maternal grandparents, Sherrell and Irene Prestridge. By all accounts, Mr. Waldrop loved the Prestridges and they loved him. When Mr. Waldrop was 19, he and his wife Clara lived in the Prestridges' home. By then, both Sherrell and Irene had become ill and disabled. Sherrell had heart issues, hip problems, and difficulty walking. Irene was blind and bedridden. Because of their infirmities, the Prestridges had converted the living room of their home into a bedroom equipped with two hospital beds.

On April 5, 1998, Mr. Waldrop and Clara left the Prestridges' home and checked into a hotel, where Mr. Waldrop smoked an undetermined amount of crack cocaine. Later that evening, the couple returned to the Prestridges' home, planning to steal money to buy more drugs. Soon after the couple arrived, Mr. Waldrop and his grandfather Sherrell began arguing about

money. Mr. Waldrop then retrieved a knife and stabbed Sherrell 43 times, killing him, while his grandmother Irene begged him to stop. As Sherrell died, Irene told her husband that she loved him and would see him in heaven. After Mr. Waldrop killed Sherrell, he went outside and removed gloves from the trunk of his car. He returned to the house and instructed Clara to kill Irene. Clara cut and stabbed Irene twice, but she could not finish what she started. Mr. Waldrop then took the knife from Clara and stabbed his grandmother 38 times. Before she died, Irene told Mr. Waldrop that she loved him.

After the murders, Mr. Waldrop went into the bathroom and cleaned off the blood. He instructed Clara to take Sherrell's wallet, and she did so. Mr. Waldrop changed out of his clothes and put them, along with the knife, in a plastic bag which he threw into a river. Then, Mr. Waldrop and Clara used the money in Sherrell's wallet to buy more crack cocaine. They were arrested later that day, and both of them confessed to killing Sherrell and Irene.

### B

The State of Alabama charged Mr. Waldrop with three counts of capital murder. During the guilt phase of the trial, defense counsel presented the testimony of several witnesses, including Mr. Waldrop's mother and a neuropharmacologist. We summarize the pertinent testimony below.

Mr. Waldrop's mother, Shirley Irelan, testified that she was only 14 years old when she gave birth to Mr. Waldrop, and that the Prestridges raised him because she "didn't know how to take care of a baby, and the father was not really responsible either." She also testified that Mr. Waldrop had been affected by his parents' divorce, and that she noticed he had a substance-abuse problem when he was 16.

Dr. Randall Tackett, a professor of neuropharmacology and toxicology, testified about the effects of crack cocaine addiction. He explained that crack cocaine is a "reinforcing drug" that creates "such a craving that it becomes almost the number one thing in a person's life." He explained that he had examined Mr. Waldrop's statement to the police, the video tape of the crime scene, and other reports and witness statements. He opined that Mr. Waldrop was a cocaine addict who had killed his grandparents because he was desperate to "get out of the craving stage" and "get the necessary funds to buy the drug." Cocaine addiction, he said, is a disease that would have affected Mr. Waldrop's ability to form the intent to kill. On cross-examination, however, he admitted that he had never examined Mr. Waldrop.

During his guilt phase closing argument, Mr. Waldrop's counsel argued that the jury should find Mr. Waldrop guilty only of felony murder because his addiction to crack cocaine negated the intent necessary for capital murder. Counsel used Dr. Tackett's testimony to explain that an addict chooses drugs "above family, chooses it above religion and morals, his brothers, his sisters, his grandparents—cocaine is everything." The jury found Mr. Waldrop guilty on all three counts of capital murder—i.e., two counts of capital murder during a robbery in the first degree, in violation of Ala. Code § 13A-5-40(a)(2), and one count of capital murder of two or more persons pursuant to a common scheme, in violation of Ala. Code § 13A-5-40(a)(10).

### C

The penalty phase began immediately after the jury returned its guilty verdict and lasted four hours. The state presented no additional evidence. Mr. Waldrop testified on his own behalf, and he also present-

ed the testimony of Dr. Tackett and the county sheriff.

Mr. Waldrop explained that in December of 1997 he began using crack cocaine, heroin, and methamphetamine on a near-daily basis. He told the jury that he committed the crimes because of the drugs he was using: "I love my grandparents very much and at that time I was on these drugs—I mean I was not—I wasn't the person that I am now. I mean, it was like this was all I cared about. I didn't care about my family. I didn't care about my wife. I didn't care if I hurt myself or anybody else."

Dr. Tackett reiterated that he believed Mr. Waldrop was addicted to cocaine and that the addiction is akin to a disease that "changes ... the brain chemistry" and "produce[s] abnormal behaviors." He also explained that crack cocaine would exacerbate the emotional issues that someone with Mr. Waldrop's background would have. Lastly, the county sheriff testified that Mr. Waldrop had not caused any problems while he was incarcerated pending trial.

After the penalty-phase hearing, the jury recommended a sentence of life imprisonment by a 10-2 vote. Following the jury's recommendation, the trial court scheduled a final sentencing hearing where it heard the parties' arguments on the aggravating and mitigating circumstances. Neither party presented new evidence at the hearing.

The state argued that a death sentence was warranted because the aggravating circumstances outweighed the mitigating circumstances. It asserted that the jury had already found one statutory aggravating circumstance—that the murders were committed during a robbery—when it convicted Mr. Waldrop of capital murder during a robbery in the first degree, and that made death the appropriate sentence. The state also argued, as a second statutory aggravating circumstance, that a death sentence was warranted because the murders were "especially heinous, atrocious, or cruel."

Defense counsel argued that four statutory mitigating factors applied: (1) Mr. Waldrop had a relatively minor criminal record; (2) he committed the murders while under the influence of extreme mental or emotional disturbance; (3) his capacity to conform his conduct to the requirements of law was substantially impaired; and (4) he was only 19 at the time of the crimes. Mr. Waldrop's counsel also relied on a number of non-statutory mitigating factors—that Mr. Waldrop was from a broken home, was remorseful, had a good work record, and had behaved well while incarcerated—to support his argument against a sentence of death.

In its sentencing order, the trial court found that the state had proven both statutory aggravating circumstances: the murders were committed during a robbery, and they were especially heinous, atrocious, or cruel. The trial court generally found that Mr. Waldrop had established the four statutory mitigating circumstances, but accorded those circumstances almost no weight. *See, e.g.,* R-68 at 5 (explaining that it was giving no "real weight" to Mr. Waldrop's lack of "significant history of prior criminal activity"), at 8 ("The [defendant's age] is not due to be given a great deal of weight."). With respect to the non-statutory mitigating circumstances, the trial court found that Mr. Waldrop was not remorseful, and concluded that his difficult upbringing, good work history, and good behavior in prison did not constitute mitigating circumstances.

The trial court determined that the aggravating circumstances outweighed the mitigating circumstances, and imposed a

sentence of death despite the jury's recommendation.

**D**

On direct appeal, the Alabama Court of Criminal Appeals ruled that the trial court's "sentencing order contain[ed] several errors that may [have] affect[ed] the ... imposition of the death sentence." *Waldrop v. State*, 859 So.2d 1138, 1144 (Ala. Crim. App. 2000). Because of these errors, the Court of Criminal Appeals remanded the case to the trial court to reweigh the mitigating and aggravating circumstances and issue a new sentencing order.

On remand, the trial court again imposed a death sentence. It found the same statutory aggravating circumstances as before. In contrast to the original sentencing order, however, the trial court only found two statutory mitigating circumstances—that Mr. Waldrop lacked a significant criminal history, and that he was only 19 years old at the time of murders. The trial court made the same findings on the nonstatutory mitigating circumstances as it did the first time around, concluding that coming from a broken home, having a good work record, and behaving well while incarcerated were not mitigating circumstances.

Upon return from remand, the Court of Criminal Appeals affirmed Mr. Waldrop's conviction and sentence. *See id.* at 1152 (opinion on return to remand). The Alabama Supreme Court then granted Mr. Waldrop's request for certiorari "to determine whether the trial court's sentencing order stated sufficient reasons for overriding the jury's recommendation of life imprisonment," *Ex parte Waldrop*, 859 So.2d 1181, 1184 (Ala. 2002), and to determine the effect, if any, of the United States Supreme Court's then-recent decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Alabama Supreme Court ultimately affirmed Mr. Waldrop's conviction and sentence, and the United States Supreme Court denied Mr. Waldrop's petition for a writ of certiorari. *See Waldrop v. Alabama*, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003).

**E**

In April of 2004, Mr. Waldrop filed a petition for postconviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. The state collateral court summarily dismissed several of Mr. Waldrop's claims and held an evidentiary hearing on the claims concerning the alleged ineffective assistance of trial counsel. Mr. Waldrop presented several witnesses and documentary evidence. The state presented no evidence.

Mr. Waldrop's trial counsel, Charles Gillenwaters, explained his preparation for the case. He remembered reviewing Mr. Waldrop's prison records and speaking to him numerous times, his former employer, and maybe also his sister. But his main contact was Mr. Waldrop's mother, because, according to counsel, "much of the family was not very cooperative." In addition to speaking to these individuals and retaining Dr. Tackett as an expert, he attended part of Clara's trial, which was before the same judge who presided over Mr. Waldrop's case.

Counsel also shared what he knew about Mr. Waldrop's background:

> I knew that his grandparents were primarily [the] people that raised him. I know that his mother had him at a very young age. I knew that [Mr. Waldrop] had dropped out of school at around seventh grade or so. That he met Clara and married Clara. That most of the time his grandparents provided him a

home, provided him monies if he needed monies, and that basically his father and mother left the raising to his grandparents.

He also understood that Mr. Waldrop and his grandparents had a loving relationship, and he knew that Mr. Waldrop had no prior criminal record. He testified that Mr. Waldrop never told him that he had been abused.

Despite knowing that Mr. Waldrop had come from a "broken family," counsel did not investigate Mr. Waldrop's upbringing any further. He did not obtain Mr. Waldrop's medical records or school records as possible mitigation evidence in preparation for the penalty phase of the proceedings. He also did not speak with several family members who stated during the Rule 32 hearing that they would have testified about Mr. Waldrop's childhood. In fact, other than talking to Mr. Waldrop, counsel acknowledged not doing "a whole lot of anything" to prepare for the final sentencing hearing before the trial judge.

Counsel's decision not to investigate Mr. Waldrop's childhood at length was the product of another decision, made early in his preparation, to focus on cocaine addiction as the primary mitigating circumstance. This is how he explained that choice:

I thought [the cocaine addiction] was the one chance that we had to convince the jury, and hopefully the judge, that [Mr. Waldrop] did not need to die for this crime. . . .

And I know that with the sentencing phase, we did argue that he came from a broken family, his age, and the fact that he had no prior criminal record. And I think those were all factors that I considered. But I think that you had to overcome in this case the fact that he, indeed, did kill his grandparents. And the chilling part of this or the really difficult thing was the pictures, the video scene of the case, all of that went to 12 people here that were probably very shocked by that. . . . And I knew that was very graphic, very hard to overcome. And the only way that I felt that we could do that was to show that he lost his will . . . he needed the [$]600 or $700 that his grandparents had to buy crack cocaine for [himself] and Clara. And, if it meant killing them, that's what the addiction called for.

Several of Mr. Waldrop's family members also testified at the evidentiary hearing. Violence, more than anything else, was the overarching theme in their account of Mr. Waldrop's life.

Mr. Waldrop's mother testified that her father Sherrell beat her repeatedly throughout her life, including during her pregnancies. She depicted her family as belligerent and constantly fighting, including with weapons. And she admitted trying to kill herself several times.

She also testified about the physical abuse Mr. Waldrop endured. Not only did Mr. Waldrop's father—Wesley—hit, slap, and choke Mr. Waldrop, but he also threw food at him. Mr. Waldrop's mother, for her part, admitted hitting Mr. Waldrop with her fists, belt buckles, and brooms. She once hit him with a large glass ashtray that cut him and left a scar. Sherrell occasionally also whipped Mr. Waldrop.

Mr. Waldrop's sister, Kristy Fortenberry, confirmed the extensive physical abuse her brother suffered. She testified that their mother once fired a gun at a car that Mr. Waldrop and his father were driving. Their mother, who was standing only a few feet away, apparently only missed because the gun "didn't shoot straight." On another occasion, Mr. Waldrop's mother, holding a gun, threatened to shoot the children.

Mr. Waldrop's household was riddled with domestic abuse. According to Mr. Waldrop's mother, Wesley would hit her in front of their children. To repel him, she would bite and stab him. Once, she pointed a gun at him and pulled the trigger, but she did not kill him because the gun had no bullets. As he got older, Mr. Waldrop would interfere to protect his mother, and end up fighting his father. Mr. Waldrop's brother confirmed their parents' violence. He testified that he saw his parents throwing things at each other, including a television.

The evidence presented at the Rule 32 hearing highlighted other troubling aspects of Mr. Waldrop's childhood as well. For instance, Mr. Waldrop grew up in poverty. His mother explained that the family struggled to put food on the table, often resorting to stealing and charity. She also said that they would go days or weeks without electricity, and that the children often lacked clean clothes for school. Mr. Waldrop's mother, moreover, regularly neglected her son. She acknowledged frequently leaving her children to spend time with other men, sometimes for days or even weeks at a time. Mr. Waldrop's grandparents would look after him in his mother's absence.

There was also evidence regarding Mr. Waldrop's lengthy history of substance abuse, in addition to his addiction to crack cocaine. His paternal aunt testified that he was exposed to chewing tobacco when he was four years old. His mother said that he started huffing gasoline at age eight or nine, and that he began smoking marijuana when he was about 16.

The abuse and poverty described by Mr. Waldrop's mother, sister, and brother were not witnessed by anyone outside of Mr. Waldrop's immediate family. For example, Freddie Whitley, Mr. Waldrop's pastor, testified that Mr. Waldrop had clean clothes, never looked like he was going hungry, never spoke of problems at home, and, as far as Reverend Whitley could tell, never had bruises, cuts, or any indication of abuse. Mr. Waldrop's seventh grade teacher also never saw any bruises, black eyes, or behavioral problems that indicated abuse.

Similarly, Phyllis Lipham, who lived down the street from Mr. Waldrop and his family for decades, testified that she never saw Sherrell hit his kids or his grandchildren. And although she witnessed the police coming to the Waldrops' home often, she said that she never knew the children to go without food, that they always looked as though they were provided for, and that she witnessed no signs of abuse.

Mr. Waldrop's mother testified that she relayed much of this information to counsel before Mr. Waldrop's trial and sentencing. She said she told counsel about the physically abusive childhood Mr. Waldrop experienced; his drug use; the fact that Mr. Waldrop and his wife, Clara, lost a child, and how this deeply affected Mr. Waldrop; that Mr. Waldrop and his grandparents loved one another; and that Mr. Waldrop cared for his grandparents when they were ill. Mr. Waldrop's sister, brother, and aunt, stated that counsel never contacted them before Mr. Waldrop's trial or sentencing.

Mr. Waldrop tried to introduce the testimony of two expert witnesses at the Rule 32 hearing. The state collateral court, however, excluded both experts on the ground that Mr. Waldrop's collateral counsel failed to comply with the court's discovery orders requiring them to submit witness summary statements.

The state collateral court denied Mr. Waldrop's ineffective assistance of counsel claim after the evidentiary hearing. It concluded that Mr. Waldrop had not demon-

strated that counsel's representation was deficient, nor that he was prejudiced by any alleged deficiency.

### F

Mr. Waldrop appealed the denial of his Rule 32 claims. In *Waldrop v. State*, 987 So.2d 1186 (Ala. Crim. App. 2007), the Alabama Court of Criminal Appeals affirmed. It first affirmed the state collateral court's exclusion of the expert testimony proffered by Mr. Waldrop, and then turned to his ineffectiveness claim.

After setting forth the correct legal standard under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny, the Court of Criminal Appeals discussed trial counsel's performance. It reviewed counsel's credentials and preparation, the evidence put on during Mr. Waldrop's trial and sentencing, and the state collateral court's factual findings and conclusions of law following the Rule 32 hearing. The Court of Criminal Appeals concluded that the state collateral court's findings and conclusions were "supported by the record," and adopted them. *See Waldrop*, 987 So.2d at 1200.

Generally speaking, the state collateral court discounted the testimony that Mr. Waldrop's upbringing was abusive and violent. The findings adopted by the Court of Criminal Appeals include, in relevant part, that Mr. Waldrop's mother conveyed to trial counsel (though "how much detail," exactly, is unknown) the circumstances of Mr. Waldrop's background before trial and sentencing; that her account of Mr. Waldrop's abusive childhood was not credible; that certain evidence of physical and substance abuse endured by Mr. Waldrop's family before he was born was irrelevant; that the evidence, contrary to collateral counsel's argument, did not show that Mr. Waldrop did well in structured environments; and that, in light of the various

witnesses who never saw any indication of abuse or neglect, the testimony by Mr. Waldrop's mother and sister about violence and physical abuse in the Waldrop household was "greatly exaggerated." *Id.* at 1197–1200. "In sum," the Court of Criminal Appeals agreed that "the 'evidence' presented by Mr. Waldrop at his evidentiary hearing [was not] particularly credible or relevant." *Id.* at 1199.

"Based on the evidence produced at the hearing," *id.* at 1200, the Court of Criminal Appeals rejected Mr. Waldrop's argument that trial counsel had not conducted a reasonable investigation into all potential mitigation evidence, such as his abusive childhood. It explained that this was "not a case where counsel failed to investigate, a case where counsel was ignorant of what evidence could be presented in mitigation, or a case where counsel presented no mitigation evidence." *Id.* at 1202. Instead, trial counsel performed a reasonable investigation and simply "chose not to concentrate on [Mr.] Waldrop's childhood" after he made the "reasoned strategic decision" to focus on the cocaine-addiction defense. *See id.* at 1201–02.

With respect to prejudice, the Court of Criminal Appeals determined, as had the state collateral court, that the Rule 32 hearing "did not provide any additional credible mitigating circumstances that [trial counsel] either failed to discover or present." *Id.* at 1199. It also decided that the result of Mr. Waldrop's sentencing would not have been different had trial counsel presented the evidence introduced at the Rule 32 hearing because "evidence of an abusive childhood environment would have hurt [Mr.] Waldrop given that he was charged with killing his grandparents—the two people who were his primary caregivers during his childhood." *Id.* at 1200.

The Alabama Supreme Court denied Mr. Waldrop's subsequent petition for certiorari.

### G

Mr. Waldrop filed his § 2254 petition on June 30, 2008, raising numerous claims for relief. In March of 2014, the district court denied Mr. Waldrop's habeas petition, entered judgment against him, and granted a certificate of appealability on whether Mr. Waldrop "was denied the effective assistance of counsel due to counsel's allegedly deficient investigation and preparation for the penalty phase of trial." *Waldrop v. Thomas*, No. 3:08-CV-515-WKW, 2014 WL 1328138, at *99 (M.D. Ala. 2014). Mr. Waldrop moved for reconsideration, but his motion was denied.

Mr. Waldrop timely appealed. We granted Mr. Waldrop's motion to expand the certificate of appealability to include two additional issues: whether the trial judge considered race in deciding to sentence him to death, in violation of the United States Constitution; and whether Alabama's sentencing scheme, which allows judicial override of the jury's recommendation of a life sentence, violates the Sixth, Eighth, and Fourteenth Amendments.

### II

"When reviewing a district court's grant or denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1330 (11th Cir. 2016).

The Alabama state courts denied the three claims before us on the merits, so our review is subject to the Antiterrorism and Effective Death Penalty Act of 1996, which generally circumscribes federal court review. *See, e.g., Lynch v. Sec'y, Fla. Dep't of Corr.*, 776 F.3d 1209, 1217 (11th

Cir. 2015). Under AEDPA, a federal court may not grant habeas relief on any claim "adjudicated on the merits" in state court unless that state court's decision was either:

> (1) ... contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or
>
> (2) ... based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding.

28 U.S.C. § 2254(d).

A petitioner can succeed under § 2254(d)(1) by satisfying either the "contrary to" or "unreasonable application" clause. A state court decision is "contrary to" clearly established federal law when the state court: "(1) applied a rule in contradiction to governing Supreme Court case law; or (2) arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts." *Dill v. Allen*, 488 F.3d 1344, 1353 (11th Cir. 2007). A state court decision cannot be contrary to clearly established federal law "where no Supreme Court precedent is on point." *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "A state court's application of clearly established federal law ... is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting *Richter*, 562 U.S. at 101, 131 S.Ct. 770).

If we determine that a state court's adjudication of a claim is contrary to or an unreasonable application of federal law, we

no longer owe that decision any deference under AEDPA. We instead "undertake a de novo review of the record." *McGahee v. Alabama Dep't Of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009).

Under § 2254(d)(2), a federal court must accord a state court's factual determinations "substantial deference," *Brumfield v. Cain*, —— U.S. ——, 135 S.Ct. 2269, 2277, 192 L.Ed.2d 356 (2015), and presume that they are correct unless the petitioner rebuts that presumption by "clear and convincing evidence." *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001) (quoting § 2254(e)(1)). This presumption of correctness is limited to findings of facts and does not apply to mixed determinations of law and fact. *See Tanzi v. Sec'y, Florida Dep't of Corr.*, 772 F.3d 644, 651 (11th Cir. 2014). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination." *Brumfield*, 135 S.Ct. at 2277 (internal quotation marks omitted). "If the petitioner can rebut that presumption, we are not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Tanzi*, 772 F.3d at 651 (internal quotation marks omitted).

## III

Mr. Waldrop seeks habeas relief under § 2254 on the ground that he did not receive effective assistance of counsel as required by the Sixth Amendment. He contends that trial counsel failed to perform an adequate investigation into his background and mental health, and failed to prepare adequately for the penalty phase of the trial.

## A

For Mr. Waldrop to succeed in his claim of ineffective assistance of counsel, he must show two things under *Strickland*:

that his trial counsel's performance was deficient, and that he was prejudiced by the deficiency. *See* 466 U.S. at 687, 104 S.Ct. 2052.

Deficient performance means that defense counsel's "representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. When reviewing counsel's actions, courts must be "highly deferential" and "indulge a strong presumption that counsel's conduct" was reasonable. *See id.* at 689–90, 104 S.Ct. 2052. *See also Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (explaining that the petitioner has the burden of showing, by a preponderance of the evidence, that counsel's performance was unreasonable). The test is whether "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).

To demonstrate prejudice when defense counsel's alleged deficiency occurred at the penalty phase of a capital trial, a habeas petitioner needs to show that, "but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009). A "reasonable probability" is one "sufficient to undermine confidence in [the sentence]," not necessarily that "counsel's deficient conduct more likely than not altered the outcome of [the petitioner's] penalty proceeding." *Id.* at 44, 130 S.Ct. 447 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052). "To assess that probability, [a court] consider[s] the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh[s] it against the evidence in aggravation." *Id.* at

41, 130 S.Ct. 447 (internal quotation marks and brackets omitted).

## B

██ The Alabama Court of Criminal Appeals denied Mr. Waldrop's ineffectiveness claim on the merits on collateral review in *Waldrop*, 987 So.2d at 1200–02, ruling that he failed to show both deficient performance and prejudice. So we must defer to its resolution of *Strickland*'s two prongs unless Mr. Waldrop establishes that one of the exceptions in § 2254(d) applies. *See Kokal v. Sec'y, Dep't of Corr.*, 623 F.3d 1331, 1345–46 (11th Cir. 2010) (reviewing, with AEDPA deference, the highest state-court decision to have decided the petitioner's claim on the merits).

Mr. Waldrop's mother testified, and the state courts found, that she had told counsel about Mr. Waldrop's abusive and drug-dependent background before the trial. *See Waldrop*, 987 So.2d at 1197 (adopting the finding that, although "how much detail she provided" is unknown, Mr. Waldrop's mother "did confirm that she did provide this information to [trial counsel]"), at 1202 ("[T]his is not … a case where counsel was ignorant of what evidence could be presented in mitigation. . . ."). As we will explain shortly, under § 2254(d)(2), we are not in a position to second-guess this finding because it was based on a credibility assessment.

Given this finding, we assume, without deciding, that counsel rendered deficient representation at the penalty phase of the trial not for failing to investigate Mr. Waldrop's upbringing, but for failing to present the evidence he had learned from Mr. Waldrop's mother, which was later introduced at the Rule 32 hearing. We also assume, without deciding, that the Court of Criminal Appeals' contrary decision was an unreasonable application of *Strickland* and its progeny. But as we will explain,

even with these two assumptions, Mr. Waldrop is not entitled to relief under § 2254 because he has not demonstrated that the Court of Criminal Appeals' determination that he was not prejudiced by his counsel's deficient performance was an unreasonable application of federal law or based on an unreasonable determination of the facts. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("[Courts need not] address both components of the [ *Strickland* ] inquiry if the [petitioner] makes an insufficient showing on one.").

## C

In sentencing Mr. Waldrop to death, the state trial court remarked that "[n]othing about this defendant's family background distinguishes itself as a mitigating circumstance." Mr. Waldrop maintains that the evidence presented in the Rule 32 hearing "mitigates the crime and decisively contradicts the [state trial court's]" characterization of his upbringing and of the offense. *See* Br. of Appellant at 30. "Had [trial] counsel conducted a minimally adequate investigation" and "presented evidence to correct the [state trial court's] mistaken belief," the argument goes, there is a reasonable probability that Mr. Waldrop would have been spared the death penalty. *See id.* at 31, 130 S.Ct. 447.

There is no doubt that Mr. Waldrop's abusive childhood, violent home life, and exposure to drugs from an astonishingly early age, if true, constitute relevant mitigation evidence because "of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct.

2242, 153 L.Ed.2d 335 (2002). None of this evidence, which was developed at the Rule 32 hearing, was presented in any meaningful way at either the guilt or penalty phases of Mr. Waldrop's capital trial. But that omission, by itself, does not guarantee Mr. Waldrop success under § 2254.

The main hurdle Mr. Waldrop has to overcome is the state collateral court's finding (adopted by the Court of Criminal Appeals) that most of the evidence depicting his upbringing as abusive and violent was not credible, largely because the court determined that his mother and sister were not credible witnesses and that nobody else corroborated their testimony. *See Waldrop*, 987 So.2d at 1199 (adopting the state collateral court's findings that the Rule 32 hearing did not reveal "any additional *credible* mitigating circumstances that [trial counsel] either failed to discover or present," and that the testimony Mr. Waldrop offered to substantiate his abusive childhood was not "particularly credible or relevant" and "greatly exaggerated") (emphasis added).

This finding is important, because when reweighing the mitigating and aggravating circumstances for purposes of *Strickland* prejudice, evidence discredited by a state collateral court in its factfinding capacity is tantamount to no evidence. *See Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 846 (11th Cir. 2011) (explaining that petitioner's constitutional claim turned on the "existence of exculpatory evidence [that was withheld]," and concluding that petitioner failed to show that any "exculpatory evidence was ... withheld" because the state collateral court did not find his evidence credible at a postconviction evidentiary hearing). And because "the credibility and demeanor of a witness [are] questions of fact," *id.* at 845, we must accord the state collateral court's factual findings substantial deference unless they are "unreason-

able ... in light of the evidence presented in the [s]tate court proceeding." § 2254(d)(2).

Mr. Waldrop, therefore, is stuck with the Court of Criminal Appeals' determination that he failed to establish prejudice because he did not present "any additional credible mitigating circumstances that [trial counsel] either failed to discover or present," *Waldrop*, 987 So.2d at 1199, unless he can show that the state collateral court's factual finding that he did not suffer the kind of abusive and violent childhood described by his mother was unreasonable in light of the evidence he presented at the Rule 32 hearing. That is a high burden: "[t]o be unreasonable, the error in the state court's finding must be so clear that there is no possibility for fairminded disagreement." *Holsey*, 694 F.3d at 1260 (internal quotation marks omitted). We do not think the state collateral court's factual findings were unreasonable.

For starters, virtually all of the testimony about abuse and violence came from Mr. Waldrop's mother and, to a lesser extent, his sister. The state collateral court did not believe their accounts of the abuse Mr. Waldrop endured, instead finding that their depictions of violence and poverty were "greatly exaggerated." *Waldrop*, 987 So.2d at 1199. It also elected not to credit the testimony, singularly provided by Mr. Waldrop's mother, that Mr. Waldrop's maternal grandfather, Sherrell, regularly beat his daughter, even as she was pregnant with Mr. Waldrop.

The state collateral court's incredulity towards Mr. Waldrop's mother and sister had some basis in the record. Ms. Irelan, like most mothers probably would, testified that she loves her son, that she did not want him to die, and that she "couldn't handle losing [him]." From this testimony, and the fact that she had just lost her

parents, the state collateral court reasonably observed that, "clearly[,] [she] ha[d] an interest in the outcome of [the Rule 32] hearing." *Waldrop*, 987 So.2d at 1198. Similarly, because Mr. Waldrop's sister had been convicted of a crime that, under Alabama law, affected her credibility, the state collateral court also had a reason to approach her testimony with some apprehension. *See id.* at 1199 (citing the Alabama Rules of Evidence).

Yet even with such indicia of unreliability, the state collateral court could not have completely disregarded the testimony of Mr. Waldrop's mother and sister had it been undisputed. As we have said before, the Supreme Court in *Porter* "prohibit[ed] ... state court[s] from discounting entirely the mitigating effect of undisputed testimony offered in mitigation." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1330 (11th Cir. 2013).

In this case, however, non-nuclear family witnesses disputed the version of Mr. Waldrop's childhood offered by his mother and sister. And the state collateral court, conflicting evidence in hand, understandably declined to credit uncorroborated testimony by a self-interested witness and another with tarnished credibility.

Instead, the state collateral court reasonably relied on the testimony of the other, more neutral witnesses in finding that Mr. Waldrop's mother and sister overstated the abuse he had suffered. In summarizing that testimony, it explained:

> Freddie Whitley, Barrett Holloway, Phyllis Lipham, and Retha McGehee, all of whom were called by Mr. Waldrop, never saw any marks or bruises on Mr. Waldrop, never saw anyone hit or strike him, and never observed Mr. Waldrop appear to be hungry or without proper clothing. These witnesses were Mr. Waldrop's preacher, teacher, neighbor, and [paternal] aunt. If there had been "daily fights" between Mr. Waldrop and his father involving hitting with fists and hands and choking or being hit with belt buckles someone would have noticed something.

*Waldrop*, 987 So.2d at 1199. Having observed the demeanor of all these witnesses firsthand, this decision was nothing more than a credibility assessment made by the court in its factfinding capacity. *See Nejad v. Attorney Gen., State of Georgia*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("Having listened to the testimony live and observed the demeanor of the witnesses, the trial court credited [the government's witness over the petitioner's].").[1]

---

1. Mr. Waldrop, relying on *Porter*, argues that, because *Strickland* requires the sentencer to consider mitigation evidence, "where there is a conflict in the evidence about the import of mitigating evidence that may require credibility determinations, it is 'not reasonable to discount entirely the effect that ... testimony might have had on the jury or the sentencing judge.'" Br. of Appellant at 44–45 (quoting *Porter*, 558 U.S. at 43, 130 S.Ct. 447). And so, as far as prejudice goes, Mr. Waldrop accuses the state courts of discounting his mitigation evidence wholesale, and unreasonably discounting the effect such evidence would have had at the penalty phase.

Mr. Waldrop, however, misreads *Porter*, which says nothing about whether credibility judgments made by a state collateral court in its factfinding capacity provide a basis to discount evidence. *See Porter*, 558 U.S. at 43–44, 130 S.Ct. 447 (addressing two errors by the Florida Supreme Court: the failure to recognize that certain evidence was relevant as nonstatutory mitigating evidence, even though it did not qualify as a statutory mitigator; and misunderstanding the relevance of some mitigating evidence). Indeed, we have explained that *"Porter* does not prohibit a state [collateral] appellate court from deferring to a credibility determination made by a [collateral] trial court." *Evans*, 703 F.3d at 1330.

The state collateral court also did not believe other portions of Mr. Waldrop's mother's testimony for different, equally reasonable reasons. For instance, in response to her accusation that her father Sherrell was physically abusive, the court recounted the conflicting testimony of Ms. Lipham, "the Prestridges' and Waldrops' neighbor, ... [who] testified that she never saw [Sherrell] hit his children." *Waldrop*, 987 So.2d at 1198. It then noted how peculiar it was that his mother's version went uncorroborated when his aunts, who "were present in court the day of the hearing and on his witness list," *id.*, and at least one of whom had allegedly been beaten, could have been called to testify in support. *Cf. Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) (partially relying on a peculiar omission in petitioner's testimony to conclude that the state court's refusal to credit petitioner was reasonable).

To be sure, there was some corroboration for the violence described by Mr. Waldrop's mother and sister. Mr. Waldrop's brother confirmed that his mother and father fought extensively. He even specifically remembered an incident in which a television was thrown. The state collateral court did not explicitly pass on his testimony. But the Court of Criminal Appeals seemed to not have made much of it, noting, after reviewing and accepting the state collateral court's findings, that "[f]ew witnesses at the evidentiary hearing offered any negative insight into Waldrop's upbringing except his mother." *Waldrop*, 987 So.2d at 1200.

Given the incongruity between the testimony of Mr. Waldrop's nuclear family—which was mostly discredited for self-interest, exaggeration, or on some other ground—and the other witnesses who testified at the Rule 32 hearing, the state collateral court was well within its discretion to believe the more benign version of Mr. Waldrop's childhood. We cannot now, under § 2254 review, second-guess that decision. *See Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (explaining, pre-AEDPA, that "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

In any event, the Court of Criminal Appeals' decision was not contrary to *Porter* because it did not "discount[ ] entirely the mitigating effect," *Evans*, 703 F.3d at 1330, of an abusive childhood in its *Strickland* analysis. *See Waldrop*, 987 So.2d at 1200–02 (analyzing mitigation evidence and concluding that whatever evidence of abuse there was would have likely hurt Mr. Waldrop). In reweighing the evidence to assess prejudice, there simply was not much credible, relevant evidence presented at the Rule 32 hearing with which Mr. Waldrop could sufficiently undermine confidence in the outcome of his sentence. This is true even if we afford significant mitigating weight to the jury's life recommendation. *See Ex parte Carroll*, 852 So.2d 833, 836 (Ala. 2002).[2]

---

**2.** Mr. Waldrop, quoting *Williams v. Allen*, 542 F.3d 1326, 1343 (11th Cir. 2008), argues that prejudice "is more easily shown in jury override cases because of the deference shown to the jury recommendation." Br. of Appellant at 46. More recently, we stated, to the contrary, that "jury recommended life imprisonment counsels *against* a determination that Lee was prejudiced under *Strickland*." *Lee v. Comm'r,*

*Alabama Dep't of Corr.*, 726 F.3d 1172, 1196 (11th Cir. 2013) (emphasis added). Either way, Mr. Waldrop has not cited a decision from the United States Supreme Court in support, so any failure by the Court of Criminal Appeals to give the jury's life recommendation significant weight in its prejudice analysis would not pierce AEDPA's deference. *See* § 2254(d)(1).

First, to the extent the Waldrop household was marred by some degree of physical violence, neglect, and substance abuse, such evidence could have proven double-edged. The sentencing transcript and orders make clear, for example, that the sentencing judge did not generally deal in sympathy for those with broken pasts. More importantly, the depiction of life in the Waldrop household provided by Mr. Waldrop's mother becomes a much weaker mitigating circumstance when one considers that Mr. Waldrop's siblings lived there too. Yet there is no evidence that they engaged in the same kind of abhorrent criminal behavior, or even that they succumbed to the substance abuse which Mr. Waldrop practically argues was the inevitable outcome of his environment. *See Kormondy v. Sec'y, Florida Dep't of Corr.*, 688 F.3d 1244, 1283 (11th Cir. 2012) (noting the "obvious limitations" of an abusive and destitute upbringing as mitigation evidence when there are other siblings who were also brought up in the same environment "yet ... emerged as law abiding citizens").

Second, Mr. Waldrop murdered his grandparents, the two pillars of stability in his otherwise troubled childhood. Even though there was testimony that Sherrell sometimes whipped Mr. Waldrop, the overwhelming, undisputed account of their relationship was a loving one. So we think it was reasonable for the Court of Criminal Appeals to conclude that presenting Mr. Waldrop's troubled childhood to either the jury or the sentencing judge could have hurt him because he was charged with killing the only two people who consistently loved and cared for him. *See Waldrop*, 987 So.2d at 1200. At the very least, it would have blunted its mitigating effect.

These shortcomings become more problematic when one considers the heinous nature of the murders. Mr. Waldrop viciously slashed his grandfather to death as his crippled grandmother begged him to stop. Taking his time, he then went to the car to grab gloves, returned, and ordered Clara to murder his grandmother. When she could not do so, he took the knife from her and stabbed his grandmother 38 times, covering her face and slitting her throat as she reminded him how much she loved him. Overcoming these murders requires more mitigation evidence than a double-edged, discredited rendition of a troubled childhood, especially when the only people who allegedly made that childhood somewhat bearable were the victims.

Given the aggravating circumstances, the state collateral court's reasonable discrediting of most of the mitigation evidence presented at the Rule 32 hearing, and the potential for the remaining credible evidence to have hurt Mr. Waldrop, we cannot say that the Court of Criminal Appeals unreasonably applied *Strickland* when it determined that Mr. Waldrop had not been prejudiced by trial counsel's failure to present the additional Rule 32 evidence at the penalty phase of his trial. *See* § 2254(d)(1). Accordingly we affirm the denial of Mr. Waldrop's claim of ineffective assistance of trial counsel.[3]

---

**3.** Mr. Waldrop also argues that "[e]vidence about the underlying psychological disorders for which [Mr. Waldrop] attempted to self-medicate with crack cocaine makes the addiction more mitigating than aggravating and weakens the aggravation that the judge weighed heavily in imposing death." Br. of Appellant at 33. He insists that the testimony of the psychologists he attempted to introduce at this Rule 32 hearing would have convinced the sentencing judge that his cocaine addiction was "the product of a tragic environment, not an attempt to get high off an illegal recreational drug." *Id.* The problem Mr. Waldrop faces, however, is that the testimony of his expert psychologists was never before the state court, and therefore cannot serve as a basis for relief under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) ("We now hold that

## IV

Mr. Waldrop next contends that the trial court took his race into account when it decided to impose the death penalty. On July 25, 2000, the trial court held a hearing to reweigh the mitigating and aggravating circumstances on remand from the Court of Criminal Appeals. During that hearing, the trial court judge stated: "If I had not imposed the death sentence, I would have sentenced three black people to death and no white people." Mr. Waldrop claims that this comment shows his sentence was affected by considerations of his race, in violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

### A

The Court of Criminal Appeals, on direct appeal, reversed the trial court's initial sentence in part because the sentencing judge had erroneously considered uncharged and unproven offenses as part of Mr. Waldrop's criminal history. It remanded the case to the trial court to reweigh the mitigating and aggravating circumstances, and to issue a new sentencing order with specific written factual findings in support of the court's conclusion that the murders committed by Mr. Waldrop were especially heinous, atrocious, or cruel. *See Waldrop*, 859 So.2d at 1152.

At the hearing on remand, the trial court discussed Alabama's capital sentencing scheme, which allows judicial override of the jury's sentencing recommendation:

In the remand and in your presentation you have mentioned something about the jury override. The Supreme Court of the United States, and I want to be very, very careful in how I state what I'm about to state. I don't want to be misunderstood about this. The Supreme Court of the United States has recognized the validity of the Alabama statutory scheme that allows a judge to override a jury to impose a death sentence even if life without parole is suggested; and, to impose life without parole, even if a death sentence were suggested by the jury. The wisdom of that position is that judges can be in a position to have a broader range of experience in dealing with capital cases.

The trial court judge then shared his own experience imposing the death penalty:

So, that left four cases in which I have imposed a death sentence. In two of those cases I have overridden the jury, and this has to be understood, it has nothing to do with why you do things, you know. The why is, on imposing the death sentence, is because the aggravating circumstances outweigh the mitigating circumstances, and the person did it, and that's all you take into account. Nothing else. If I had not imposed the death sentence, I would have sentenced three black people to death and no white people. And, that's the reason that the Supreme Court of the United States trusts the judgment of judges, perhaps, a little bit more.

The trial court judge concluded his remarks on the matter by explaining the decision to override the jury's recommendation in Mr. Waldrop's case:

Now, frankly, if there's going to be a death penalty in the State of Alabama, and it is going to be judged based on weighing the aggravating circumstances against the mitigating circumstances, then ... Bobby Waldrop needs to get the death sentence, and if we are not going to do it that way, then we don't need to do it at all.... And, this is what

review under § 2254(d)(1) is limited to the

record that was before the state court....").

I have to look at when I apply the aggravating against the mitigating circumstances in this case. It is not even close. Even when I give full measure, full and complete measure, as much [ ] weight as can be given, to the fact that there are no prior convictions, this is not a close case. This was a cold, heinous, atrocious, and cruel killing. A needless killing. And, if we are going to have a death penalty, this case was made for it. . . .

We have a sacred trust to enforce the law. I am comfortable with the decision in this case and it is the right decision if we are going to have a death penalty in the State based upon statutory circumstances of aggravation and statutory circumstances of mitigation, and I don't have any inclination to change the ruling. I will reword the order to include those things that may be missing that the Court of Criminal Appeals wants to see, but I'm not willing to take the responsibility for not applying the law equally in this case. And, I would not be applying the law equally to everybody if Bobby Waldrop doesn't get the death sentence in this case.

After the hearing, the trial court issued a new order resentencing Mr. Waldrop to death.

The case returned to the Court of Criminal Appeals, which gave Mr. Waldrop "an opportunity to file a supplemental brief and to raise any additional issues." *Waldrop*, 859 So.2d at 1152 n.1. He did not, however, raise the racial bias claim. The Court of Criminal Appeals affirmed.

The first time Mr. Waldrop raised his racial bias claim was on direct appeal in his petition for certiorari review in the Alabama Supreme Court under Alabama Rule of Appellate Procedure 39. Rule 39 provides that "[c]ertiorari review is not a matter of right, but of judicial discretion. A

petition for a writ of certiorari will be granted only when there are special and important reasons for the issuance of the writ." The Alabama Supreme Court granted certiorari review, but not on the racial bias claim. *See Ex parte Waldrop*, 859 So.2d at 1184 (explaining that it granted Mr. Waldrop's petition for certiorari review "to determine whether the trial court's sentencing order stated sufficient reasons for overriding the jury's recommendation of life imprisonment" and the impact of *Ring*). The state contends, and the district court found, that Mr. Waldrop failed to exhaust the state remedies available for his racial bias claim.

**B**

Before asserting a federal claim under § 2254 in federal court, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), (c), "thereby giving the [s]tate the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (internal quotation marks omitted). To satisfy the exhaustion requirement, the petitioner must have "fairly present[ed]" his claim "in each appropriate state court (including a state supreme court with powers of discretionary review)." *Id.* (quoting *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995)). The question, then, is whether Mr. Waldrop fairly presented his racial bias claim to the Alabama state courts when he raised it for the first time before the Alabama Supreme Court on discretionary review.

In *Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), the Supreme Court considered the nearly identical question of "whether the presentation of claims to [Pennsylvania's] highest court on discretionary review, without

more, satisfies the exhaustion requirements of 28 U.S.C. § 2254." In that case, the state prisoner had presented his claims for the first time to the Pennsylvania Supreme Court in a petition for "allocatur review," which is granted "not [as] a matter of right, but of sound judicial discretion." *Id.* at 347, 109 S.Ct. 1056. The Supreme Court unanimously held that presenting the claims in that kind of discretionary proceeding did not exhaust them under 28 U.S.C. § 2254(d).

Several years later, we held that the rule in *Castille* bars a petitioner from seeking federal habeas review of claims that were raised for the first time in a petition for a writ of certiorari before the Georgia Supreme Court. *See Mauk v. Lanier*, 484 F.3d 1352, 1358 (11th Cir. 2007). We explained:

> Because the Georgia Supreme Court's decision to grant certiorari is discretionary, and because certiorari can only be granted in cases "which are of gravity or great public importance," Ga. Const. art. VI, § 6, ¶ 5, we cannot say, in light of *Castille*, that Mauk has fairly presented his claims. Mauk's claims were presented in a procedural context in which the merits were not considered, as the Georgia Supreme Court's denial of certiorari does not constitute a ruling on the merits. We thus must conclude that Mauk has not fairly presented his federal constitutional claims to the Georgia courts

and thus has failed to exhaust his state remedies.

*Id.* (citations omitted).

This case is materially indistinguishable from *Castille* and *Mauk*. Like the standards for granting allocator review in *Castille* and certiorari review in *Mauk*, certiorari review by the Alabama Supreme Court "is not a matter of right, but of judicial discretion," and will only be granted "when there are special and important reasons." Ala. R. App. P. 39(a). And, as with the Georgia Supreme Court, a denial of a writ of certiorari by the Alabama Supreme Court is not a decision on the merits. *See Ex parte McDaniel*, 418 So.2d 934, 935 (Ala. 1982).[4]

■ Because Mr. Waldrop presented his racial bias claim "for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons,'" *Castille*, 489 U.S. at 351, 109 S.Ct. 1056 (quoting Pa. R. App. P. 1114), and because the denial of his petition on the racial bias claim was not a decision on the merits, he did not fairly present his claim to the Alabama state courts. Accordingly, Mr. Waldrop did not exhaust the Alabama state court remedies for his racial bias claim. And since those remedies are no longer available because of state-law procedural limitations, *see* Ala. R. Crim. P. 32.2(b) (barring successive collateral petitions), 32.2(c) (limitations period), Mr. Waldrop's failure constitutes a procedural bar

4. We recently held that, in Georgia, a summary denial of a certificate of probable cause to appeal by the Georgia Supreme Court is a decision on the merits for purposes of § 2254 because the certificate is properly denied only when the appeal lacks "arguable merit." *Wilson v. Warden, Georgia Diagnostic Prison*, 834 F.3d 1227, 1233 (11th Cir. 2016) (en banc), *cert. granted sub nom. Wilson v. Sellers*, —— U.S. ——, 137 S.Ct. 1203, 197 L.Ed.2d 245 (2017). A certificate of probable cause, however, is different from a petition for certiorari review. The former is the mechanism for Georgia Supreme Court review in the state postconviction collateral context, whereas the latter is the mechanism in the state direct appeal context. *See* O.C.G.A. § 9-14-52 (habeas corpus proceedings); O.C.G.A. § 5-6-15 (providing that writ of certiorari by Georgia Supreme Court is as provided in Ga. Const. art. VI, § 6, ¶ 5, which limits writ to cases of "gravity or great public importance").

to federal habeas review under § 2254. *See Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief....").

### C

Mr. Waldrop raises three arguments in an attempt to get around the failure to exhaust and ensuing procedural default.

■ First, he argues that he fairly presented his racial bias claim to the Alabama state courts because, unlike the Pennsylvania Supreme Court in *Castille*, the Alabama Supreme Court "is empowered to notice any error in a capital case, whether or not it is raised below," Br. of Appellant at 50, and because Alabama law *requires* counsel in death penalty cases to petition the Alabama Supreme Court for a writ of certiorari. *See* Ala. R. App. P. 39(a)(2)(D). These two procedural differences do not distinguish this case from *Castille* and *Mauk*. Even though defense counsel in an Alabama capital case must seek a writ of certiorari, certiorari review is still, like in *Castille* and *Mauk*, ultimately a "matter . . . of judicial discretion." Ala. R. App. P. 39(a). As for the ability to notice plain errors, we have previously explained that "a state appellate court's routine plain error review of a conviction or sentence *does not,* standing alone, excuse a procedural default." *Peoples v. Campbell,* 377 F.3d 1208, 1235 n.55 (11th Cir. 2004). Indeed, we have specifically held that Alabama's "plain error rule does not preclude a finding of procedural default." *Julius v. Johnson,* 840 F.2d 1533, 1546 (11th Cir.) (internal quotation marks omitted), *opinion modified on denial of reh'g,* 854 F.2d 400 (11th Cir. 1988).

Mr. Waldrop's second argument is that the Alabama Supreme Court "actually passed" on the racial bias claim because its opinion stated: "After carefully reviewing the record of the guilt phase, the penalty phase, and the sentencing phase of [Mr.] Waldrop's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor." *Ex parte Waldrop,* 859 So.2d at 1193. This argument, too, ignores our precedent. Time and again we have said that "the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below." *Julius,* 840 F.2d at 1546. The sentence Mr. Waldrop relies on, moreover, is not the Alabama Supreme Court's. It is, instead, a wholesale quote from the Alabama Court of Criminal Appeals—which did *not* have the racial bias claim before it. *See Waldrop,* 859 So.2d at 1181 (opinion on return to remand). So that language alone cannot excuse the failure to exhaust and procedural default. *See, e.g., Magwood v. Smith,* 791 F.2d 1438, 1444 (11th Cir. 1986) (concluding that several of the petitioner's claims were procedurally defaulted even though the Alabama appellate court's opinion contained similar language to the one Mr. Waldrop points to in this case).

Even if, however, this case were distinguishable from *Julius* because the Alabama Supreme Court, where Mr. Waldrop did raise his racial bias claim, adopted the quote as its own, the result would not be any different. "When . . . [a state] appellate court, in conducting plain error review, identifies a specific constitutional claim, ignores the fact that the claim has been defaulted [under state procedural rules], and decides the claim on the merits, we treat the claim on habeas review as if the petitioner had not defaulted the claim and pass on its merits." *Campbell,* 377 F.3d at 1235 n.55. But that is simply not

what occurred here. The Alabama Supreme Court never identified Mr. Waldrop's racial bias claim for review. In fact, it said nothing whatsoever about that claim, instead granting certiorari review on two unrelated claims. To read the Alabama Supreme Court's borrowed general statement as a tangential ruling on the merits not only runs afoul of what we said in *Campbell*, but it also overrides state procedural law (in contravention of comity), which provides that denying certiorari review is not a decision on the merits of a claim. *See Ex parte McDaniel*, 418 So.2d 934, 935 (Ala. 1982).

■ Finally, Mr. Waldrop contends that we can disregard his procedural default because allowing his death sentence to stand in light of the sentencing judge's statements would be a "fundamental miscarriage of justice." Br. of Appellant at 52. In this context, where a petitioner's procedurally defaulted claim asserts an infirmity with his death sentence and not his underlying conviction, the "miscarriage of justice" exception to procedural default requires the petitioner to show "by clear and convincing evidence that, but for [the alleged] constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

As we will further explain shortly, the jury, not the sentencing judge, found Mr. Waldrop "eligible for the death penalty" under Alabama law when it returned guilty verdicts on the two counts of capital murder during a robbery. The jury's finding of guilt occurred long before the sentencing judge made the allegedly racially charged comments, so those comments could not have been the but-for cause of the verdicts. Mr. Waldrop, moreover, does not even challenge his conviction, which serves as

the predicate for his death sentence. He therefore cannot demonstrate actual innocence, and we cannot overlook the procedural default on the basis of a miscarriage of justice. *See also Fults v. GDCP Warden*, 764 F.3d 1311, 1318 (11th Cir. 2014) (holding that petitioner's claim of juror racial bias was not excepted from default as a miscarriage of justice because petitioner had not shown that he was actually innocent of the death penalty).

To conclude, we cannot review Mr. Waldrop's racial bias claim under AEDPA because it is not exhausted and is therefore defaulted, and he has not established cause and prejudice to excuse his default. Nor has Mr. Waldrop shown that he is actually innocent of the death penalty such that a miscarriage of justice would result from our failure to review this claim.

## V

After the jury recommended a life sentence, the trial court found that two aggravating circumstances existed. One of the aggravating circumstances was implicit in the jury's verdict—that the capital offenses were committed while Mr. Waldrop was engaged in a robbery. The second aggravating circumstance was that the murders were especially heinous, atrocious, and cruel as compared to other capital offenses. After weighing these aggravating circumstances against the mitigating circumstances, the trial court sentenced Mr. Waldrop to death.

Mr. Waldrop contends that his death sentence, imposed by judicial override of the jury's recommended sentence, violates the Sixth Amendment's guarantee of a trial by jury. The Alabama Supreme Court rejected Mr. Waldrop's Sixth Amendment claim, reasoning that the jury's guilty verdict made Mr. Waldrop eligible for the death penalty. Based on our precedent, we affirm.

## A

The Sixth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees all criminal defendants a right to a trial by an impartial jury. To satisfy the Sixth Amendment, a jury must find each element of a crime beyond a reasonable doubt. *See, e.g., Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013). In *Apprendi v. New Jersey*, 530 U.S. 466, 482–83, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that a sentencing scheme violates the Sixth Amendment if it "removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone."

In 2002, while Mr. Waldrop's case was pending on direct appeal, the Supreme Court extended its holding in *Apprendi* to the capital sentencing context in *Ring*. In *Ring*, the Supreme Court considered the constitutionality of Arizona's capital sentencing scheme. Under Arizona law, at the time, the crime of first-degree murder was punishable by death or life imprisonment. But a defendant convicted of first-degree murder could not be sentenced to death unless the trial court determined that at least one aggravating circumstance existed. *See Ring*, 536 U.S. at 592–93, 122 S.Ct. 2428. The Supreme Court held that Arizona's capital sentencing scheme was incompatible with the Sixth Amendment because it empowered the court to make the critical finding of fact—i.e., the presence or absence of an aggravating circumstance—that raised a defendant's maximum penalty from life imprisonment to death. *See id.* at 609, 122 S.Ct. 2428.

Recently, in *Hurst v. Florida*, —— U.S. ——, 136 S.Ct. 616, 619, 193 L.Ed.2d 504 (2016), the Supreme Court, applying *Ring*, held that Florida's capital sentencing scheme violated the Sixth Amendment. Mr. Hurst was convicted of first-degree murder, a capital crime under Florida law. *See id.* at 619–20. That conviction, without more, made a defendant eligible for a maximum sentence of life imprisonment without the possibility of parole. *See id.* at 620. At the time, Florida's capital sentencing scheme provided that a person convicted of first-degree murder was eligible for the death penalty only if, at the conclusion of a separate sentencing hearing, death was found to be the appropriate sentence. *See id.* The imposition of the death penalty involved a two-step process. First, a jury would recommend an advisory sentence (of life or death) without specifying the facts upon which the recommendation was based. *See id.* Second, the trial court would give the jury's recommendation "great weight," but nevertheless independently determine whether aggravating and mitigating circumstances existed and whether the aggravating circumstances outweighed any mitigating circumstances. *See id.*

In Mr. Hurst's case, the advisory sentencing jury found at least one aggravating circumstance proven beyond a reasonable doubt (but it was unclear which one(s)) and recommended by a vote of 7-5 that Mr. Hurst be sentenced to death. *See id.* at 619–20. The trial court then independently found two statutory aggravators proven beyond a reasonable doubt, balanced the aggravators and mitigators, and sentenced Mr. Hurst to death.

The Supreme Court explained that, under Florida's scheme, the maximum punishment a defendant could have received without court-made findings was life in prison without parole. *See id.* at 622. Despite the role of the advisory jury in the process, a court was authorized to increase a defendant's authorized punishment

"based on [its] own factfinding." *Id.* *Hurst* held that the Sixth Amendment requires a state to base a death sentence "on a jury's verdict, not a judge's factfinding." *Id.* at 624. "Florida's sentencing scheme, which required the [court] alone to find the existence of an aggravating circumstance, [was] therefore unconstitutional." *Id.*

## B

Alabama law bifurcates the guilt and penalty phases of a capital defendant's trial. *See* § 13A-5-45. A defendant convicted of a capital offense cannot be sentenced to death unless at least one statutory aggravating circumstance, as defined in Ala. Code § 13A-5-49, exists. *See* § 13A-5-45(f). Certain capital offenses, like the murders during a robbery for which Mr. Waldrop was convicted, have a built-in aggravating circumstance that corresponds to one or more aggravating circumstances listed in § 13A-5-49. So when a defendant is found guilty of such a capital offense, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing." § 13A-5-45(e).

The sentencing hearing is generally conducted before the same jury that convicted the defendant. *See* § 13A-5-46(a), (b). At the time of Mr. Waldrop's conviction and sentencing, the jury would hear the evidence and arguments of both parties, deliberate, and return an advisory verdict recommending either life imprisonment without parole (if it determined that no aggravating circumstances existed, or that the aggravating circumstances did not outweigh the mitigating circumstances) or

death (if it determined that one or more aggravating circumstances existed, and that they outweighed the mitigating circumstances). *See* § 13A-5-46(e).

Following the advisory verdict, the court would then independently determine the appropriate sentence. *See* § 13A-5-47(a). In doing so, it would "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in [§ ] 13A-5-49, each mitigating circumstance enumerated in [§ ] 13A-5-51, and any additional mitigating circumstance offered pursuant to [§ ] 13A-5-52." § 13A-5-47(d). Then, the court weighed the aggravating circumstances it found to have existed against the mitigating circumstances it found to have existed, taking into consideration the jury's advisory verdict. *See* § 13A-5-47(e). If the court found that at least one aggravating circumstance existed, and that they outweighed any mitigating circumstances, it could impose a death sentence, notwithstanding a contrary jury recommendation.[5]

## C

■ Again, our task under AEDPA is to determine whether the Alabama Supreme Court's rejection of Mr. Waldrop's Sixth Amendment claim is "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). "The phrase 'clearly established federal law' refers only to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Bates v. Sec'y, Florida Dep't of Corr.*, 768 F.3d 1278, 1288 (11th Cir. 2014) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120

---

5. Recently, Alabama amended its capital sentencing scheme. *See* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017). Under the new scheme, the jury's sentence recommendation is binding on the court. *See* § 13-A-5-47(a) (2017) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole,").

S.Ct. 1495, 146 L.Ed.2d 389 (2000)). We must determine, therefore, whether the Alabama Supreme Court's decision was contrary to or involved an unreasonable application of the Supreme Court's holding in *Ring*.[6]

The Alabama Supreme Court held that Mr. Waldrop's death sentence did not run afoul of *Ring*. It noted that "in [Mr.] Waldrop's case, the jury, and not the trial judge, determined the existence of the 'aggravating circumstance necessary for imposition of the death penalty.'" *Ex parte Waldrop*, 859 So.2d at 1188 (quoting *Ring*, 536 U.S. at 609, 122 S.Ct. 2428). Because "the findings reflected in the jury's verdict alone exposed [Mr.] Waldrop to a range of punishment that had as its maximum the death penalty," the Alabama Supreme Court held that the requirements of *Ring* and *Apprendi* were satisfied. *See id.*

The Alabama Supreme Court did not unreasonably apply *Ring* when it rejected Mr. Waldrop's Sixth Amendment claim. Mr. Waldrop became death-eligible under Alabama law when the jury convicted him of murder during a robbery in the first degree. The commission of a capital offense during a robbery is an aggravating circumstance under § 13A-5-49. As explained above, Alabama requires the existence of only one aggravating circumstance in order for a defendant to be death-eligible, and in Mr. Waldrop's case the jury found the existence of a qualifying aggravator beyond a reasonable doubt when it returned its guilty verdict. *See* § 13A-5-45(e). Mr. Ring and Mr. Hurst, by contrast, were not death-eligible based on their convictions alone. In their cases, it was the trial court's independent finding of a statutory aggravating factor that exposed them to a higher maximum punishment of death, rather than merely life imprisonment. Because the situation here is materially distinguishable from those presented in *Ring* and its progeny, the Alabama Supreme Court's decision was not contrary to and did not involve an unreasonable application of Supreme Court precedent.[7]

Mr. Waldrop also argues that *Ring* requires more than a jury finding of a statutory aggravating factor at the guilt phase. He contends that the weighing of aggravating and mitigating factors must be done by the jury. *See* Supp. Br. of Appellant at 7–9. The Alabama Supreme Court disagreed with that argument, and we cannot hold otherwise unless its application of *Ring* was so unreasonable that no "fairminded jurist" could agree with the conclusion. *See Richter*, 562 U.S. at 101, 131 S.Ct. 770.

The Alabama Supreme Court's conclusion here—that the Sixth Amendment is satisfied under *Ring* if a jury finds a qualifying aggravating factor at the guilt phase—is one that fairminded jurists could agree with. Indeed, it is consistent with Justice Scalia's explanation of the holding in *Ring*:

> statutory aggravator and the defendant is nevertheless sentenced to death by the trial court, which has made independent findings concerning aggravating and mitigating circumstances. Or when, under Alabama's new capital sentencing scheme, the jury fails to unanimously find a statutory aggravator at the penalty phase, or when it is unclear that they even agreed that any single statutory aggravator exists.

---

**6.** *Hurst* had not been decided at the time Mr. Waldrop's case was heard on direct appeal. We discuss *Hurst* only to the extent it reflects an application and explication of the Supreme Court's holding in *Ring*.

**7.** We do not decide, and we express no opinion on, whether Alabama's old capital sentencing scheme might violate the Sixth Amendment in a context not presented here. For instance, where a jury's guilty verdict does not implicitly find the existence of a

What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those [s]tates that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring*, 536 U.S. at 612–13, 122 S.Ct. 2428 (Scalia, J., concurring). It is also consistent with the rationale of *Hurst*, which applied *Ring*. *See Hurst*, 136 S.Ct. at 624 (explaining that the Sixth Amendment does not allow the trial court "to find an aggravating circumstance, *independent of a jury's factfinding*, that is necessary for imposition of the death penalty") (emphasis added).

More importantly, Mr. Waldrop's alternative argument that the Sixth Amendment forbids the trial court from independently weighing the aggravators against the mitigators is foreclosed by *Lee v. Comm'r, Alabama Dept. of Corrs.*, 726 F.3d 1172 (11th Cir. 2013). In *Lee*, as here, an Alabama jury found the existence of an aggravating circumstance when it convicted the defendant of murder during the course of a robbery. *See id.* at 1197–98. We concluded that "[n]othing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict." *Id.* at 1198. We went on to hold that "*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances." *Id. See also Ring*, 536 U.S. at 597 n.4, 122 S.Ct. 2428 ("[Mr. Ring] does not question the Arizona Supreme Court's authority to reweigh the

aggravating and mitigating circumstances after that court struck one aggravator.").

■ The only distinction between this case and *Lee* is that here the trial court found an additional aggravating factor (that the crime was heinous, atrocious, and cruel) not found by the jury. But *Ring* concerned death eligibility. Once Mr. Waldrop was convicted, the jury had already found the only "aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609, 122 S.Ct. 2428. The trial court's finding of an additional aggravating circumstance did not increase the maximum penalty to which Mr. Waldrop was exposed, and therefore falls outside the clearly established holding in *Ring*.

## VI

The district court's denial of Mr. Waldrop's petition for a writ of habeas corpus is affirmed.

## AFFIRMED.

MARTIN, Circuit Judge, concurring in the judgment:

After Bobby Waldrop was convicted of capital murder, ten Alabama jurors voted to spare his life. But under Alabama law at the time, this vote was merely advisory, and the trial judge was free to override it.

[1] Mr. Waldrop's judge did just that. He overrode the jury's recommendation for life and sentenced Mr. Waldrop to death. In announcing his decision, the judge commented, "If I had not imposed the death sentence, I would have sentenced three black people to death and no white people." So was Mr. Waldrop—who is white—sentenced based on his race? He believes

---

1. As the majority explains, Alabama has since amended its capital sentencing scheme, and a

judge can no longer override the jury's sentence. See Ala. Code § 13A-5-47(a).

he was. But this Court cannot reach his claim on federal habeas review because it is procedurally defaulted. Under U.S. Supreme Court precedent, a federal court may not hear the merits of a defaulted claim unless the petitioner demonstrates "cause and prejudice" or that review of the claim is necessary to correct a "fundamental miscarriage of justice." See Coleman v. Thompson, 501 U.S. 722, 748, 111 S.Ct. 2546, 2564, 115 L.Ed.2d 640 (1991). Mr. Waldrop puts forward the seemingly uncontroversial argument that "imposing the death penalty based on the defendant's race constitutes a 'fundamental miscarriage of justice.'"

However, U.S. Supreme Court precedent confines the miscarriage of justice exception to cases in which a capital defendant claims he is "actually innocent" of the crime of conviction or the penalty imposed. See Schlup v. Delo, 513 U.S. 298, 321–23, 115 S.Ct. 851, 864–65, 130 L.Ed.2d 808 (1995); Sawyer v. Whitley, 505 U.S. 333, 336, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992) (holding that "to show 'actual innocence' [of the death penalty] one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law"). The facts of Mr. Waldrop's case do not allow an argument that he is actually innocent, and he does not make one.

I must therefore agree with my colleagues that Mr. Waldrop has not met the legal standard for showing there has been a fundamental miscarriage of justice. But I am at a loss to otherwise explain how a person being sentenced to death based on his race could be anything other than a fundamental miscarriage of justice. We know, for example, that the Supreme Court recently characterized race discrimination in criminal sentencing as "a disturbing departure from a basic premise of our criminal justice system"—that people are punished "for what they do, not who they are." Buck v. Davis, 580 U.S. ——, 137 S.Ct. 759, 778, 197 L.Ed.2d 1 (2017). And the Court has also recently ruled (not in the context of a death sentence) that the no-impeachment rule precluding a court's review of the merits of a juror bias claim must give way when there is clear evidence that a juror relied on racial stereotypes or animus to convict a criminal defendant. See Pena-Rodriguez v. Colorado, 580 U.S. ——, 137 S.Ct. 855, 869–70, 197 L.Ed.2d 107 (2017). But even in light of these clear pronouncements from our highest court, Mr. Waldrop is not the first capital defendant to face procedural obstacles in making a claim that racial bias played a part in his being sentenced to death.[2] I fear he will not be the last.

I agree with the majority's conclusion that Mr. Waldrop is not entitled to federal habeas relief on his ineffective assistance of counsel claim. However, even separate from my concern about Mr. Waldrop's racial bias claim, I cannot agree with all of the reasoning employed by the majority in reaching this conclusion. To begin, I reject the notion put forward in the majority opinion, that evidence that Mr. Waldrop's childhood "was marred by some degree of

---

**2.** In 2014, this Court concluded that Kenneth Fults's claim of juror racial bias was procedurally defaulted and thus barred from federal habeas review. Fults v. GDCP Warden, 764 F.3d 1311, 1315 (11th Cir. 2014). Tonight, the State of Georgia plans to execute Keith Tharpe, who also has a procedurally defaulted claim that one of his jurors was racially biased. See Tharpe v. Warden, No. 5:10-cv-00433-CAR, slip op. at 5–6 (M.D. Ga. Sept. 5, 2017).

physical violence, neglect, and substance abuse ... could have proven double-edged" at sentencing. Maj. Op. at 915. He was only a child. The Supreme Court has made clear that "evidence of a turbulent family history" and an abusive childhood is "particularly relevant" mitigating evidence when, as here, the defendant is young. Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982); see also Porter v. McCollum, 558 U.S. 30, 43, 130 S.Ct. 447, 455, 175 L.Ed.2d 398 (2009) (noting that "evidence of [an] abusive childhood" may have "particular salience" for the jury). And although I am aware this Court has said that substance abuse can sometimes be a "two-edged sword," this idea has no application in cases like this one, where a child abuses substances to escape a bleak home life. See Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1355 & n.20 (11th Cir. 2011) (quotation omitted).

I also reject this Court's precedent, relied on by the majority, that the mitigating impact of Mr. Waldrop's terrible upbringing is lessened because his siblings did not engage in similarly "abhorrent" criminal behavior. See Maj. Op. at 915. First, it's not obvious to me why the mitigating effect of a defendant's traumatic experience would in any way be lessened because his brother or sister has not committed a similarly serious offense. Childhood abuse is considered mitigating because it may influence the sentencer's appraisal of the defendant's moral culpability, see Williams v. Taylor, 529 U.S. 362, 398, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000), not because the abuse may predispose a person to violent behavior later in life. Beyond that, it seems unwise to make comparisons between siblings in this context because we don't typically know much about the defendant's family members. We are examining Mr. Waldrop's sentence, so there has been no adversarial testing of any fact we might point to regarding Mr. Waldrop's siblings or how their upbringing may have affected their lives. We have no record, for example, of whether his siblings also struggle with substance abuse. See Maj. Op. at 915. We do know that Mr. Waldrop's sister engaged in some criminal activity, and the majority points to this fact as reason to doubt her testimony. Maj. Op. at 913. And of course we have no way of knowing what has happened in the lives of Mr. Waldrop's siblings in the years since the evidentiary record closed in this case.

Finally, the majority opinion brings to light an apparent inconsistency in our circuit's precedent about how we analyze prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when a judge overrides a jury's recommendation that a defendant's life be spared. See Maj. Op. at 914 n.2. In Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008), this Court said that prejudice "is more easily shown in jury override cases because of the deference shown to the jury recommendation." Id. at 1343 (quotation omitted). More recently, in Lee v. Commissioner, Alabama Department of Corrections, 726 F.3d 1172 (11th Cir. 2013), we suggested the opposite—that it is harder to show prejudice in a jury override case. See id. at 1196 (stating that the jury's recommendation for a life sentence "counsels against a determination that Lee was prejudiced under Strickland"). The majority points out that this inconsistency in our precedent doesn't matter here because Mr. Waldrop has not shown that the Alabama court's decision was contrary to U.S. Supreme Court precedent, which is necessary to overcome the deference we owe that decision under the Antiterrorism and Effective Death Penalty Act. See 28 U.S.C. § 2254(d)(1). The majority's legal analysis

is correct when it says this inconsistency does not affect the outcome of Mr. Waldrop's case. Still, it is worth noting that our circuit's prior panel precedent rule requires us to follow <u>Williams</u> because it was issued before <u>Lee</u>.[3] <u>See</u> <u>United States v. Archer</u>, 531 F.3d 1347, 1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc."). And that aside, I see no basis for accepting that it would be more difficult to show prejudice in a jury override case. <u>Strickland</u>'s prejudice inquiry asks whether there is a reasonable probability of a different outcome had the unpresented mitigation evidence been introduced at trial. <u>See</u> 466 U.S. at 694–95, 104 S.Ct. at 2068–69. To answer that question, we simply look to the probable effect of the new mitigation evidence on the sentencer—here, the judge.

---

**3.** The precedent that <u>Williams</u> relied on dates back to 1987. <u>See</u> <u>Harich v. Wainwright</u>, 813 F.2d 1082, 1093 n.8 (11th Cir.1987), <u>adopted by en banc court</u>, 844 F.2d 1464, 1468–69 (11th Cir.1988) (en banc), <u>overruling on other grounds recognized in</u> <u>Davis v. Singletary</u>, 119 F.3d 1471, 1482 (11th Cir.1997). <u>Lee</u> relied on two cases: <u>Parker v. Allen</u>, 565 F.3d 1258 (11th Cir. 2009), also issued after <u>Williams</u>, and <u>Routly v. Singletary</u>, 33 F.3d 1279 (11th Cir.1994) (per curiam). <u>Routly</u> never said it is harder to show prejudice in a jury override case. Instead, it simply said a

defendant cannot show that a failure to present mitigating evidence to the jury "prejudiced him to any degree whatsoever <u>in the jury's</u> consideration of penalty" when the jury has recommended a life sentence. <u>See</u> <u>id.</u> at 1297 (emphasis added). <u>Routly</u> then went on to separately consider the issue of prejudice as it related to the judge's selection of sentence, concluding that there was no prejudice because the allegedly unpresented mitigation evidence was already before the judge in the form of a presentence investigation report and an expert report. <u>Id.</u>